LOUISVILLE & NASHVILLE RAILROAD CO. *v.* GAINES,
Comptroller, etc.

*(Circuit Court, M. D. Tennessee.  ———, 1880.)*

1. STATUTORY CONSTRUCTION—EXEMPTION FROM TAXATION.—The charters of the earlier railroad companies incorporated by the state of Tennessee contained exemptions from taxation; but in later charters the legislature, to save repetition, instead of enumerating all the powers and immunities intended to be granted, was content to refer to some earlier charter, and give to the new company "all the rights, powers, and privileges" of the old. It is clear that the legislature intended to confer these "rights, powers, and privileges" as fully as if specifically repeated in the new charter; and such was the recognized construction of such charters by all the departments of the state government for more than 20 years.

2. SAME—SAME—"PRIVILEGE."—Where one railroad company is incorporated with the "rights, powers, and privileges" of a pre-existing company, the new company acquires an exemption from taxation guarantied to the former. The word "privilege" includes in its ordinary definition an exemption or immunity from taxation.

Cases cited—*State* v. *Betts,* 4 Zabriskie, 555-556; *Humphrey* v. *Pegues,* 16 Wall. 244; *Morgan* v. *Louisiana,* 93 U. S. 217-223; *Railroad Companies* v. *Gaines,* 97 U. S. 697, 711-712.

3. CONSTITUTIONAL LAW—EXEMPTION FROM TAXATION.—The legislature of a state may contract in a corporate charter for exemption of the corporate property from taxation, unless there be some constitutional prohibition. No such prohibition is contained in the Tennessee constitution of 1834.

Cases cited—*Tomlinson* v. *Branch,* 15 Wall. 460; *K. & O. R. Co.* v. *Hicks,* 1 Legal Rep. 343.

4. STATUTORY CONSTRUCTION — WHEN FEDERAL COURTS WILL FOLLOW STATE COURTS. — Ordinarily, the federal courts follow the ruling of the state courts in their interpretation of the constitutions and statutes of their respective states; but where property has been acquired and investments made under statutory contracts, generally recognized and believed to be constitutional, in the absence of adjudications declaring them invalid, the federal courts are not concluded by the con-

struction which the state courts may give to such statutes subsequent to the acquisition of such property rights.

Cases cited—*Olcott* v. *Supervisors*, 16 Wall. 678; *Pine Grove* v. *Talcott*, 19 Wall. 666.

5. SAME — EXEMPTION FROM TAXATION. — An exemption from taxation cannot be implied from the apparent spirit or general purpose of a statute. It must be certain and explicit; every well-founded doubt must be resolved in favor of the state. But this rule does not call for a strained construction, adverse to the real intention of the legislature; and to ascertain that intention the court will look to the context, as well as to the particular words used, taking into consideration the contemporaneous surroundings, and the purposes which the legislature had in view.

6. SAME — USE OF SAME WORD IN DIFFERENT CONSTITUTIONS OR STATUTES.—The fact that the constitutson of a state uses a word (*e. g.*, the word "privilege") in one sense in one clause, is no evidence that it is used in the same sense in every other clause; and, were it used in but one sense throughout the constitution, it would not follow that the legislature used it in the same sense in statutes subsequently passed. Even in the same statute a word is often used with distinctly different meanings, the courts giving to it in each instance the meaning which the legislature intended it to have in that particular connection.

7. CONSTITUTIONAL LAW — INJUNCTION — TAXES. — Where a state has, by valid contract, exempted certain property from taxation, it cannot by subsequent legislation subject that property to taxation, nor prohibit the United States courts from using their injunctive powers to protect the contract from violation.

8. INJUNCTION—TAXES.—While the general rule is that courts will not enjoin the collection of taxes upon the mere ground that they are excessive or illegal, yet if their exaction is unconstitutional, and the party assessed has no other adequate remedy, or their enforcement will occasion irremediable oppression and produce a multiplicity of expensive suits, an injunction to restrain their collection will be granted.

In Equity.

*Ed. Baxter*, for complainant.

*B. J. Lea*, Attorney General, for defendant.

BAXTER, C. J. By the thirty-ninth section of the act of December 11, 1845, incorporating the Nashville & Chattanooga Railroad Company, it is provided "that the capital stock of said company shall be forever exempt from taxation, and the road, with all its fixtures and appurtenances, including workshops, warehouses, and vehicles of transportation, shall be ex-

empt from taxation for the period of twenty years from the completion of the road, and no longer."

The Tennessee & Alabama Railroad Company was chartered in 1851-2, with all the "rights, powers, and privileges," and to be subject to all the "liabilities and restrictions," conferred and imposed by its charter upon the Nashville & Chattanooga Railroad Company, and amendments thereto.

The Central Southern Railroad Company was incorporated in 1853-4, with all the "powers and privileges," and to be subject to all the "restrictions and liabilities," prescribed in the charter of the Nashville & Chattanooga Railroad Company and amendments thereto, with some exceptions, not material to the determination of this case.

These two last-named companies, the Tennessee & Alabama and Central Southern, have been consolidated into the Nashville & Decatur Railroad Company.

The Nashville & Memphis, subsequently designated the Memphis & Ohio Railroad Company, was chartered in 1851-2, with all the "powers, rights, and privileges," and to be subject to the restrictions, so far as such provisions may be applicable, contained in the acts incorporating the Nashville & Chattanooga and Memphis & Charleston Railroad Companies, together with the acts amendatory of them, "as fully as if herein set forth at length, and the same are hereby declared to form and constitute a part of the charter hereby granted to the Nashville & Memphis Railroad Company."

The Memphis, Clarksville & Louisville Railroad Company was incorporated in 1851-2, and vested with all the "rights, powers and privileges," and subject "to all the restrictions and liabilities, of the Nashville & Chattanooga Railroad Company," except as therein otherwise provided, which exceptions have no bearing in this case.

The complainant is lessee of the Nashville & Decatur Railroad Company. It has consolidated with the Memphis & Ohio Railroad Company, and is the owner of the Memphis, Clarksville & Louisville Railroad, by purchase, under the act of December 22, 1870, providing for the sale of delinquent rail-

roads. By virtue of this purchase, complainant succeeded to all the *rights, privileges,* and *immunities* appertaining to the franchises of the road so sold to it under its act of incorporation and amendments thereto.

From the foregoing it will be seen that the Tennessee & Alabama Railroad Company was vested with all the "rights, powers, and privileges;" the Central Southern Railroad Company with all the "powers and privileges;" the Memphis & Ohio Railroad Company with all the "powers, rights, and privileges;" and the Memphis, Clarksville & Louisville Railroad Company with all the "rights, powers, and privileges," of the Nashville & Chattanooga Railroad Company.

The period named in said several charters, during which time the property of said companies was respectively exempt from taxation, had not elapsed when the assessment complained of was made.

The act of the twenty-fourth of March, 1875, entitled "An act declaring the mode and manner of valuing the property of railroads for taxation," enacts, section 1, "that each railroad company owning and operating a railroad in the state shall, on or before the first day of May of each year, make out and file with the comptroller of the state treasury a complete schedule of all its property, real, personal, and mixed, setting forth therein the length in miles, or fractions thereof, of its entire road-bed, switches, and side tracks, and showing how many miles, or fractions thereof, lie in the state, in each county of the state through which the road passes, and in each incorporated town, and the value of the whole and each part thereof, as subdivided herein; the total amount of capital stock; the number of engines, and their respective values; the gross annual receipts; the number of cars of all character, their classes and value; the number of depot buildings and warehouses, and other buildings; in what county and incorporated town located, and the value of each, including the lands and lots on which the same are built; the value of all machine shops, and stationary machinery and tools therein, and in what county and incorporated town located, including the land on which the same are built; all real, personal, or

mixed property belonging to the company within the state, not enumerated above, with its value."

Said act further provides for the appointment by the governor of three commissioners, to be styled "railroad assessors for the state at large." To these commissioners the comptroller is required to deliver the "schedules aforesaid." When this is done the commissioners are "to proceed to ascertain, test, and value the property belonging to said company," upon the basis prescribed in said act; and value said property and certify their estimates to the comptroller; and when such valuation is approved by the governor, secretary of state, and treasurer, the comptroller is directed to "ascertain the amount of taxes due the state, and notify the company thereof, and if not paid he may issue his distress warrant to any sheriff in the state, to be levied upon any personal or real property or franchises of the company, with power to sell the same and make a deed to the purchaser;" and "the governor is authorized to issue his warrant to any sheriff, along the line of said railroad, to put such purchaser into the possession of such road and all its property."

Said act further directs the comptroller to certify to the county court clerk of each county through which a railroad runs the amount to be taxed by said county for county purposes, and likewise to the mayors of incorporated towns through which the road passes the amount to be taxed by such towns; and the clerk is required to enter the same upon the collector's books, specifying the amount of taxes to be collected, etc.

The legislature, by the eleventh section of said act, provided further: "That every railroad company which will accept as a special amendment to its charter, for a period of ten years from the first day of January, 1875, and that will pay annually to the state 1½ per cent. on its gross receipts from all sources, shall be exempt from the provisions of the foregoing sections, (there recited above,) and the payment of said 1½ per cent. upon all gross earnings of said road shall be in full (for the period mentioned, ten years) of all taxation."

Complainant accepted the compromise thus offered, and made and delivered the schedule required by the act to the comptroller, and paid into the treasury $1\frac{1}{2}$ per cent. of its gross earnings for the year 1875, amounting to $52,712.92. But in December, 1876, the supreme court of the state, in the case of *L. & N. R. Co.* v. *Ellis*, held that the legislature had not the power, under the constitution of 1870, then in force, to enact said eleventh section, and that the same was in conflict with that instrument, and therefore inoperative and of no legal force.

Complainant then fell back on its chartered rights, claimed its 20 years' exemption, and made application to the legislature to refund the amount so paid by it under said section, which the legislature refused to do, but, in lieu, that body passed the act of the twentieth of March, 1877, entitled "An act to amend an act entitled ' An act declaring the mode and manner of valuing the property of a railroad company for taxation,' passed March 20, 1875, and to adjust the rights of the state and railroads in Tennessee under the decision of the supreme court, holding that the eleventh section of said act is unconstitutional."

This act revived substantially the machinery created by the first, and directed an assessment by the commissioners, etc., of the complainants' property aforesaid, as a basis for its taxation for the years 1875, 1876, 1877, and 1878, and then by the ninth section thereof provided:

"That all railroads of the state, which had accepted and complied with the provisions of the eleventh section of the act of March 20, 1875, shall be entitled to a credit for the amounts respectively paid by them to the state" under the assessments made by authority of said act for the years 1875, 1876, and 1877; "and, if the amounts so paid by said companies shall exceed the assessments for said years, the excess shall be refunded by the state to said railroads, with interest."

Commissioners were accordingly appointed to act under and pursuant to the provisions of the act last mentioned, who proceeded and assessed complainant's property aforesaid

for taxation at the gross sum of $3,370,700, and certified their action to the comptroller.

At this juncture complainant filed its bill, in and by which it prays for an injunction restraining the comptroller "from certifying to the county court clerk of each county, and likewise to the mayor of each incorporated town, the amount assessed as aforesaid to be taxed by said counties or towns respectively against complainant for the years mentioned;" and "if, before this application for an injunction can be made, said defendant (the comptroller) shall have made said certificate, then that by mandatory injunction he be ordered to withdraw the same," and for other and appropriate relief.

A restraining order was granted until this application could be heard, and we are now, after full argument, called on to decide whether complainant is entitled to the injunction prayed for.

The doctrine that the legislature of a state unrestricted by constitutional prohibition, has power to contract in a charter authorizing the formation of a corporation for an exemption of its property from taxation, has not been denied in the argument of this case. The right to do this has been repeatedly affirmed by the supreme court of the United States. *Tomlinson* v. *Branch*, 15 Wall. 460. And the supreme court of the state has held, in the *K. & O. R. Co.* v. *Hicks*, 1 Leg. Rep. 343, that no such prohibition is contained in the constitution of 1834—the constitution in force when the several charters, under which the complainant claims exemption, were passed. It is further admitted that the twenty-ninth section of the act incorporating the Nashville & Chattanooga Railroad Company is a good and valid exemption to *that* company for the period therein specified; and that the complainant has, by its lease, consolidation, and purchase, succeeded to all the rights, privileges, and immunities of the several corporations which it represents in this litigation. On these several propositions the parties are agreed. It is on the next and succeeding issue that the controversy arises. The complainant contends that the grant contained in the several charters to which complainant is entitled, of all the "rights and privi-

leges," or "rights, powers, and privileges," of the Nashville & Chattanooga Railroad Company, invested said corporations with an exemption of their several properties from taxation for 20 years from and after the completion of their respective roads, and that said exemption is a contract, and, as such, under the protection of the national constitution. This is *the* question in the case. The complainant affirms and the defendant denies the proposition. The controversy, therefore, narrows down to one of construction: What did the legislature intend when it conferred the "rights and privileges" of the Nashville & Chattanooga Railroad Company on the several corporations to whose rights the complainant has succeeded? Did it intend to include exemption from taxation?

This question has been twice before the supreme court of Tennessee, and in both instances it was decided in the negative, (*E. T., V. & G. R. Co.* v. *Hamblen County*, decided at Knoxville, in 1877, but not reported; and *Wilson* v. *Gaines*, 2 Legal Rep. 31;) but in both cases the learned judge delivering the opinion of the court admitted that the terms "rights and privileges," as defined by lexicographers, and understood by the jurists of other states, were comprehensive enough to carry the exemption. But the court seems to have regarded itself as precluded from giving the usual and ordinary effect to these terms, upon the assumption that the meaning of the word "privilege" had been restricted by a provision in the constitution of the state. In the case of *Wilson* v. *Gaines* the court uses this language: "However comprehensive a meaning may have been given to the term *privilege*, by the courts of other states, or by lexicographers, we are constrained to use it in the restricted sense and meaning given to it in our own laws, and especially by the constitution of the state. That it was not intended or understood to be sufficient by the framers of our constitution of 1834 to embrace exemptions, is made clear and indisputable by reference to section 7, of art. 11, of that instrument, by which it is ordained: 'The legislature shall have no power to pass any law granting to any individual or individuals rights, privileges, immunities, or exemptions other than such as may be, by the same law, extended to any

member of the community who may be able to bring himself within the provisions of such law : *provided, always,* the legislature shall have power to grant such charters of incorporation as they may deem expedient for the public good.' "

Now, these decisions are direct and emphatic against the complainant's claim of exemption, and it is insisted that they are conclusive upon this court. If so, we are relieved from all obligation "to exercise our own judgment." But is this court concluded by these decisions? Ordinarily, the federal courts adopt and follow the ruling of the state courts, in their interpretation of the constitution and statutes of their respective states. This is the rule. But to this rule there are exceptions, as well established as the rule itself. The federal courts "will follow, as of obligation, the decisions of the state courts on local questions peculiar to themselves, or on questions respecting the construction of their own constitution and laws." But if a "contract, when made, was valid under the constitution and laws of the state, as they had been previously expounded by its judicial tribunals, and as they were understood at the time, no subsequent action of the legislature or judiciary will be regarded by the federal courts as establishing its invalidity." *Olcott* v. *Supervisors,* 16 Wall. 678.

This principle was somewhat extended in the case of *The Township of Pine Grove* v. *Talcott,* 19 Wall. 666. In this case it appears that in March, 1869, the state of Michigan, by an act of its general assembly, authorized any township, city, or village in the state to pledge its aid by loan or donation, to any railroad company in the construction of its road. The defendant township voted aid to the road mentioned in the case, and issued its bonds therefor. At the time the constitutional power to do this was not controverted, but generally conceded. Numerous acts recognizing this power had been passed by the legislature ; but, after the bonds in question had been issued and negotiated on the faith of this popular and legislative construction of the constitution of the state, the supreme court of Michigan held, in two cases, that all the acts authorizing such aid by counties, cities, and town-

ships were unconstitutional. *The People* v. *Salem*, 20 Mich. 452; *Bay City* v. *State Treasurer*, 23 Mich. 499.

Encouraged by these opinions, Pine Grove township refused to pay the bonds sued on, and it was insisted in argument that the federal courts were concluded by the construction which the supreme court of the state had thus placed on the state constitution; but the supreme court of the United States held otherwise. The court say: "We have examined these cases with care," and find "that they are not satisfactory to our minds." The judgment overruling the decisions of the supreme court of Michigan is predicated mainly on the ground that the question "belonged to the domain of general jurisprudence touching commercial paper." But the reasoning of the court goes beyond this. "When," say the court, "the bonds were issued there had been no authoritative intimation from any quarter that such statutes were invalid." The legislature had passed many acts of this character, and during the period covered by their enactment "neither of the other departments of the state government lifted its voice against them." From this we infer that in all cases where property has been acquired and investments made under and in virtue of statutory contracts, generally recognized, and believed to be constitutional and valid, in the absence of adjudications declaring them invalid, the federal courts, in the exercise of their jurisdiction, and in discharge of the duties especially and peculiarly imposed on them of preserving and enforcing the national constitution, and protecting contracts against impairment, are not concluded by the construction which the state courts may, subsequent to the acquisition of such property, give to such statutes; but that the federal tribunals will, in all such cases where the construction given by the state courts "is not satisfactory to their minds," construe such statutes for themselves. Such, we understand, is the meaning of the Pine Grove case. Now, we think, this case comes within the principle announced, and we shall therefore construe the several statutes involved for ourself.

It is a legal axiom, long recognized, that an exemption from the common burden of taxation cannot be implied from

the apparent spirit or general purpose of a statute. It must be certain and explicit, and if there is any well-founded doubt, arising out of the ambiguity or obscurity of the language of the statute, as to whether the legislature intended an exemption or not, the doubt will be resolved in favor of the state. But this axiom does not call for a strained construction, adverse to the legislative intention. On the contrary, it is the duty of the court to ascertain as best it can, in accordance with the established canons of construction, the real intention of the act to be construed, and when a conclusion is reached to enforce the legislative will as it may be statutorily declared. Where the language is clear and explicit the court is bound, without considering consequences, to give it effect. It must be construed as a whole. The office of a good expositor, says My Lord Coke, "is to make construction on all its parts together." The plainest words may be controlled by the context. It is the intention expressed in the act, as a whole, that is to prevail. Courts look to the context, as well as to the words, for the meaning of particular words used in the act. They may also take into consideration the purposes the legislature was endeavoring to accomplish, acts *in pari materia*, and contemporaneous surroundings. These rules of common sense, applied from time to time in the construction of statutes, shall guide us in this instance.

The constitution commands, and, as far as was practicable, guaranties, impartiality of legislation, and this policy seems to have been adopted by the legislature, and applied to all railroad companies, as far as the circumstances of the several cases would permit. The exemption from taxation of the capital stock absolutely, and of the roads, fixtures, appurtenances, and vehicles of transportation for 20 years, seems to have been the general rule. Clauses providing for these exemptions were incorporated in the earlier charters. But in later acts the legislature, instead of inserting in each act of incorporation all the powers and immunities intended to be granted, was content to refer to some previous charter, and give to the new company "all the rights, powers, and privileges" of the old. It is, we think, clear that the legisla-

ture, as it declared in some of these acts, intended to confer these rights, powers, and privileges "as fully as if herein set forth at length," and such was the then prevailing belief. No one questioned this interpretation of these acts. No attempt was made to levy and collect a tax from these properties, from the date of said respective charters until the act of 1875. That the legislature intended, by the grant to these several companies of the "rights and privileges," and "rights, powers, and privileges," of the Nashville & Chattanooga Railway Company, to confer on them the same immunity from taxation that had been granted to the latter, we have no doubt. Are these terms, fairly construed, broad enough to include exemption? It is admitted that they are, if they are to have the usual force and effect accorded to them by lexicographers and jurists or other states; but, as hereinbefore stated, it is assumed that the meaning of the term "privilege" has been restricted by the state constitution, and that, when employed in a statute, the courts must presume that the legislature intended to restrict its meaning within the limits prescribed by the constitution.

We dissent entirely from the assumption that the constitution intended, in the provision of that instrument quoted, or any part thereof, to qualify or restrict the force and effect of plain English words. It is true that the constitution forbids the passage of laws granting rights, privileges, immunities, or exemptions to an individual or individuals, other than such as may be by the same law extended to every member of the community who can bring himself within its provisions. Now we may, for the sake of the argument, further admit that the use of these terms, in the connection in which they stand in the clause quoted, indicates that a different meaning was attached to each, and yet it does not follow that the framers of the constitution intended to give a constitutional definition to these words, and thus, by a constitutional provision, make it the duty of the court, in all instances in which they find either of them employed in a statute, to construe it as meaning the same as it does in the clause of the constitution referred to. If it occurred nowhere else in that instru-

ment than in the clause mentioned, the inference drawn therefrom would, to say the least, be a violent one. Most words possess different shades of meaning. In one connection they may mean one thing, and in another and different connection another and quite a different thing. The same word is often used with distinctly different meanings in the same statute; and yet the courts give to it, in each connection in which it is employed, the meaning which the legislature intended it to have in that particular connection. An illustration of this is found in the constitution itself in the use of this very word "privilege." It is found elsewhere in that instrument than in the eleventh article. It frequently occurs in the constitution, and is so used as to involve every shade of meaning of which it is, according to lexicographers, susceptible. Now, if the framers of the constitution have thus employed it, with one meaning in one place, and with another and different meaning in other places, what becomes of the hypothesis that its meaning has been constitutionally defined by the eleventh article? It must fall to the ground. And this, out of the way, we are at liberty to interpret the terms "rights and privileges," as defined by judicial and lexical authorities.

Webster says that *privilege* is a right or *immunity* not enjoyed by others—an *exemption* from an evil or burden; that under the Roman law it denoted some peculiar benefit, some right or advantage, not enjoyed by others, etc. Crabbe says it signifies a law made in favor of an individual. It consists of some positive advantage, *exemption*, or *immunity*. In its more extended sense it comprehends every prerogative, *exemption*, and *immunity*. Abbott defines it to be a right or immunity by way of exemption from the general law. Bouvier defines it as a private law in derogation of common right. Paschal says it is a special right belonging to an individual or class; properly an *exemption* from some duty—an immunity from some general burden or obligation. Mr. Justice Washington says that an exemption from taxes is embraced by the general description of privileges. And in *State* v. *Betts,* 4 Zabriskie, 555–6, the court say: "The term privilege includes

in its ordinary definition an *exemption* from such burdens as others are subjected to, as the *privilege* of being exempt from arrest or from *taxation.*"

From these authorities it is seen that a *privilege* is an *exemption* and an *exemption* is a *privilege.* Did the legislature mean by this language, as found in these several charters, that it should be construed in accordance with these standard authorities? On this question we are, by the decision in *Humphrey* v. *Pegues*, 16 Wall. 244, relieved of all doubt, if we ever entertained any. Here, after full argument, the court held that where one railroad company was incorporated with the "rights, powers, and privileges" of another and pre-existing company, that the new company acquired an exemption from taxation guarantied to the former, and in support thereof say: "All the privileges, as well as the powers and rights of the prior company, were granted to the latter company. A more important or more comprehensive *privilege* than a perpetual immunity from taxation can scarcely be imagined. It contains the essential idea of a peculiar benefit or advantage of a special exemption from a burden falling on others."

*Humphrey* v. *Pegues* is exactly similar to the case under consideration, and is conclusive, unless its authority has been overthrown or weakened by subsequent decisions of the same court. It is insisted that it has been overruled or materially qualified by *Morgan* v. *Louisiana*, 93 U. S. 217–223. We do not concur in this view. The questions involved in the two cases were very different. There is no conflict between them. In the first it is held that a grant to one railroad company of the "powers, rights, and privileges" of another carried to the former an exemption from taxation enjoyed by the latter, while in the second case it was decided that a foreclosure sale of the "property and franchises" of a railroad company did not vest the purchaser with an immunity from taxes possessed by the company whose property was sold; because, say the court, the "franchises" of a railroad company are such as "are essential to the operations of the corporation; positive rights or privileges, without which the road of the com-

pany could not be successfully worked," and that "immunity from taxation is not one of them."

Nor is the authority of *Humphrey* v. *Pegues* in the least shaken by the decision in *Railroad Cases* v. *Gaines*, 97 U. S. 697, 711–712. On the contrary, there is in this last case a clear recognition of the principle announced in the former, as the language of the chief justice, found on pages 711 and 712, will disclose. He says: "In *Humphrey* v. *Pegues* we held that the grant to one company of all the powers, rights, and privileges of another carried with it an exemption; but in *Morgan* v. *Louisiana*, that such an exemption did not pass by sale of the franchises of a railroad company. * * * * This seems to us conclusive of the present case. The grant here was not of all the rights and privileges of the Nashville & Chattanooga Railroad Company, but *of such as were neces- sary for the purpose of making and using the road*, or, in other words, the franchises of the company, which do not include immunity from taxation." Here it is clearly intimated that the court recognized the authority of *Humphrey* v. *Pegues*, and that but for the qualifying words, "of such as were necessary for the purpose of making and using the road," which distinguished the cases, the exemption claimed would have passed. These three cases are entirely consistent, and may well stand together.

Without accumulating authorities, which could be easily done, it will suffice for us to say that, in our opinion, the legislature, by the use of the terms "rights and privileges," as they are employed in the several statutes before us for construction, intended to vest said several corporations with the privilege of exemption from taxation for the period of 20 years after the completion of their respective roads, to the same extent that such exemption had been granted to the Nashville & Chattanooga Company; that this conclusion is sustained by lexicographers, and by the supreme court of the United States; that said charters are contracts, within the meaning of the federal constitution, the obligations of which cannot be constitutionally impaired by legislation or judicial

construction, and that it is our duty, so far as we can legitimately, to protect the rights secured by the contracts.

But can we do this by injunction? The tax demanded is due, in part, to the state, and by the act of March 21, 1873, it is provided "that in all cases in which an officer charged by law with the collection of revenue due the state shall institute any proceeding, or take any steps, for the collection of the same, alleged or claimed to be due by said officer from any citizen, the party against whom the proceeding or step is taken shall, if he conceives the same unjust or illegal, or against any statute or clause of the constitution of the state, pay the same under protest, and upon his making such payment the officer or collector shall pay such revenue into the state treasury, giving notice at the time of payment to the comptroller that the same was paid under protest, and the party paying said revenue may, at any time within 30 days after making said payment, and not longer thereafter, sue the said officer having collected said sum for the recovery thereof, and the same may be tried in any court having jurisdiction of the amount and parties; and if it is determined that the same was wrongfully collected as not being due, * * for any reason going to the merits of the same, the court trying the case *may* certify of record that the same was wrongfully paid and ought to be refunded, and thereupon the comptroller shall issue his warrant for the same, which shall be paid in preference to other claims on the treasury." The act then declares "that there shall be no other remedy" for the wrongful demand and collection of the public revenues, and inhibits the issuance of injunctions, *supersedeas*, prohibitions, and all other process designed to hinder or delay the collection thereof.

Now, without stopping to inquire or decide how far this act can lawfully restrain this court from interfering to enjoin the collection of taxes imposed by legislation on property not previously exempted from taxation, we have no hesitation in holding that it ought not to be construed, in a case like this, to paralyze the powers of this court as they existed prior to its enactment. To give to it such force would be to permit

the state effectually to legislate to impair the obligation of a contract by the enactment of a law prohibiting an adequate remedy. This cannot be tolerated, and for the purposes of this case we will proceed as if the statute last referred to had not been passed.

It is, however, the general rule, independent of statutes like the foregoing, not to interfere by injunction, preliminary or final, to prevent the collection of taxes excessive in amount or irregularly, or illegally exacted. But this rule, sound in itself, is not inexorable. If the exaction of the tax is unconstitutional, and the citizen assessed has no other remedy, or if it appears that the enforcement of payment of the tax demanded will occasion irremediable oppression, the clouding of titles, or a multiplicity of suits, etc., an injunction may issue. *State Railroad Tax Cases,* 92 U. S. 575–614. Does this case come within any of these exceptions? The statute under which it is claimed we have already declared to be in contravention of the federal constitution. The demand is for taxes from property which is, by contract, exempt from that burden. It is to be collected as well for the several counties and incorporated towns, through which complainant's roads run, as for the state. The amount demanded is large—not less, including that claimed for the towns and counties, than $40,000. Its payment will be to 12 or 15 different collectors. When collected it will go into the state, county, and municipal treasuries. Once paid in, it could be reclaimed only by suits.

The number of these suits (about 40) would have necessarily to correspond with the number of collectors, counties, and towns to whom the payments are to be made. They would be attended with delay and costs. And when a recovery was had it would be for the sum paid, without interest, and without compensation for labor and expenditures incident to the prosecution of the suits. Complainant would be exposed to all these and many other inconveniences not enumerated. Relief obtained with such sacrifices is entirely inadequate. There are several elements of equitable cognizance entering into the case to give this court jurisdiction, and justice demands the exercise of its restraining hand. The injunction

will therefore be issued as prayed for. If in this we have committed an error, the error can be easily corrected by appeal. We have given to the parties the benefit of our best convictions, and these it is our duty to follow until the court of last resort, whose decrees are final, shall decide otherwise.