ATLANTIC CLEANERS & DYERS, INC., ET AL. *v.* UNITED STATES.

No. 667. Argued April 28, 1932.—Decided May 23, 1932.

428

*Mr. Dale D. Drain,* with whom *Messrs. Alvin L. Newmyer* and *Selig C. Brez* were on the brief, for appellants.

430

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Thacher,* and *Messrs. Charles H. Weston, Russell Hardy,* and *George P. Alt* were on the brief, for the United States.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is a suit brought by the United States against appellants to enjoin them from continuing, in the District of Columbia, an alleged combination and conspiracy in restraint of trade and commerce in cleaning, dyeing and otherwise renovating clothes, contrary to § 3 of the Sherman Antitrust Act, c. 647, 26 Stat. 209; U. S. C., Title 15, § 3. Appellants answered, setting up affirmatively that they were engaged solely in the performance of labor and rendering service in cleaning, dyeing and renovating wearing apparel and other articles which had passed into the hands of the ultimate consumers thereof, and that this did not constitute trade or commerce within the meaning of the Antitrust Act. Upon motion the answer was stricken from the files, on the ground that the matter pleaded was not a valid defense. Appellants elected to stand upon their answers; and a decree was entered as prayed. The case comes here by appeal under the provisions of the Act of February 11, 1903, c. 544, 32 Stat. 823; U. S. C., Title 15, § 29. *Swift & Co.* v. *United States,* 276 U. S. 311, 322; *United States* v. *California Canneries,* 279 U. S. 553, 558.

Upon the facts which stand admitted and those affirmatively pleaded by the answers, the sole question to be determined is whether, within the meaning of § 3 of the Sherman Act, appellants are engaged in trade or commerce in the District of Columbia.

The facts, established as above, are that they are carrying on the business of cleaning, dyeing and renovating wearing apparel at plants located in the District, in part, and in some cases principally, at wholesale pursuant to contracts or engagements with numerous so-called retail

dyers and cleaners who maintain shops in the District for receiving from the public clothing to be cleaned, dyed or otherwise renovated. Appellants, in August, 1928, met together in the District and agreed to raise the then current prices charged for cleaning, dyeing and renovating clothes, and formulated and agreed upon certain minimum and uniform prices, which they, and each of them, should thereafter charge and receive for the performance of such service. They further agreed to assign and allot to one another the retail dyers and cleaners, who, thereupon, were to be held, respectively, as exclusive customers. The agreement to maintain prices and assign and allot customers has been and is being carried into effect.

Sections 1 and 3 of the Sherman Act provide as follows:

" Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. . . ."

" Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. . . ."

The words describing the activity declared to be illegal are the same in both sections, namely, " restraint of trade or commerce." The contention on behalf of appellants is that the words, being identical, should receive the same construction in § 3 as in the preceding § 1; that § 1 rests solely on the commerce clause of the Constitution; that the words " trade or commerce " in § 1 cannot be broader than the single word " commerce " as used in that clause; and that commerce does not include a business such as that carried on by appellants.

Assuming, but not deciding, that if the acts here charged had involved interstate transactions appellants would not come within the provisions of § 1, because the scope of the words " trade or commerce " must there be limited by the constitutional power to regulate commerce, it does not follow that the same words contained in § 3 should be given a like limited construction. Most words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section. Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. *Courtauld* v. *Legh,* L. R., 4 Exch. 126, 130. But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent. Where the subject matter to which the words refer is not the same in the several places where they are used, or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another, the meaning well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed. See *State* v. *Knowles,* 90 Md. 646, 654; 45 Atl. 877; *Henry* v. *Trustees,* 48 Ohio St. 671, 676; 30 N. E. 1122; *Feder* v. *Goetz,* 264 Fed. 619, 624; *James* v. *Newberg,* 101 Oreg. 616, 619; 201 Pac. 212; *County-Seat of Linn Co.,* 15 Kans. 500, 527.

It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance. *Louisville & N.*

R. Co. v. Gaines, 3 Fed. 266, 277–278. Thus, for example, the meaning of the word "legislature," used several times in the Federal Constitution, differs according to the connection in which it is employed, depending upon the character of the function which that body in each instance is called upon to exercise. Smiley v. Holm, 285 U. S. 355. And, again in the Constitution, the power to regulate commerce is conferred by the same words of the commerce clause with respect both to foreign commerce and interstate commerce. Yet the power when exercised in respect of foreign commerce may be broader than when exercised as to interstate commerce. In the regulation of foreign commerce an embargo is admissible; but it reasonably cannot be thought that, in respect of legitimate and unobjectionable articles, an embargo would be admissible as a regulation of interstate commerce, since the primary purpose of the clause in respect of the latter was to secure freedom of commercial intercourse among the states. See Groves v. Slaughter, 15 Pet. 449, 505; Steamship Co. v. Portwardens, 6 Wall. 31, 32–33; Buttfield v. Stranahan, 192 U. S. 470, 492. Compare Russell Motor Car Co. v. United States, 261 U. S. 514, 520–521.

Section 1 having been passed under the specific power to regulate commerce, its meaning necessarily must be limited by the scope of that power; and it may be that the words "trade" and "commerce" are there to be regarded as synonymous. On the other hand, § 3, so far as it relates exclusively to the District of Columbia, could not have been passed under the power to regulate interstate or foreign commerce, since that provision of the section deals not with such commerce but with restraint of trade purely local in character. The power exercised, and which gives vitality to the provision, is the plenary power to legislate for the District of Columbia, conferred by Art. I, § 8, cl. 17 of the Constitution. Under that clause,

Congress possesses not only every appropriate national power, but, in addition, all the powers of legislation which may be exercised by a state in dealing with its affairs, so long as other provisions of the Constitution are not infringed. *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 5. Undoubtedly, under that extensive power, it was within the competency of Congress to prohibit and penalize the acts with which appellants are here charged; and the only question is whether by § 3 it has done so.

A consideration of the history of the period immediately preceding and accompanying the passage of the Sherman Act and of the mischief to be remedied, as well as the general trend of debate in both houses, sanctions the conclusion that Congress meant to deal comprehensively and effectively with the evils resulting from contracts, combinations and conspiracies in restraint of trade, and to that end to exercise all the power it possessed. In passing § 1, Congress could exercise only the power conferred by the commerce clause; but in passing § 3, it had unlimited power, except as restricted by other provisions of the Constitution. We are, therefore, free to interpret § 3 dissociated from § 1 as though it were a separate and independent act, and thus viewed, there is no rule of statutory construction which prevents our giving to the word " trade " its full meaning, or the more extended of two meanings, whichever will best manifest the legislative purpose. See *United States* v. *Hartwell*, 6 Wall. 385, 396; *Sacramento Nav. Co.* v. *Salz*, 273 U. S. 326, 329–330.

We perceive no reason for holding that Congress used the phrase " restraint of trade " in § 3 in a narrow sense. It is true that the word " trade " is often employed as importing only traffic in the buying, selling or exchanging of commodities; but it is also true that frequently, if not generally, the word is used in a broader sense. This is pointed out in *The Schooner Nymph*, 1 Summ. 516, 517–518; 18 Fed. Cas. 506, No. 10,388. Construing § 32

436

of the Coasting and Fishery Act of 1793, c. 8, 1 Stat. 305, 316, which declares that any licensed ship, etc., which shall be employed in any other "trade" than that for which she is licensed shall be forfeited, Mr. Justice Story in that case said:

"The argument for the claimant insists, that 'trade' is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word 'trade' is often and, indeed, generally used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, not in the liberal arts or in the learned professions, it is constantly called a *trade*. Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoemaker, though some of these may be, and sometimes are, carried on without buying or selling goods."

A like view was taken by Pollock, B., in *Bank of India* v. *Wilson*, L. R., 3 Exch. Div. 108, 119–120.* See also

---

\* One of the earliest decisions under the common law is *Diers Case*, 2 Henry V, 5, pl. 26, which arose in the time of Henry V (1414). There a weaver had bound himself for a moderate consideration not to follow his craft within the town for a limited time. Before the expiration of the time, however, his necessities sent him back to the loom, and an action against him for damages was brought. The learned Judge, in deciding the case, not only held the obligation to be void, but quite evidently considered it criminal as well. With some display of feeling he said—" The obligation is void as being contrary to the common law and by G— if the plaintiff were here he should go to prison until he paid a fine to the King." And even a century or two later, when the rule in respect of contracts in restraint of trade had become less strict, in *Mitchell* v. *Reynolds*, 1 Peere Williams 181, 193, Parker, C. J., referring to *Diers Case*, approved the indignation of the judge, "tho' not his manner of expressing it."

*Buckelew* v. *Martens,* 108 N. J. L. 339, 156 Atl. 436; *American Laundry Co.* v. *E. & W. D. C. Co.,* 199 Ala. 154; 74 So. 58; *Campbell* v. *Motion Picture M. Op. Union,* 151 Minn. 220, 231–232; 186 N. W. 781.

We think the word "trade" was used in § 3 of the Sherman Act in the general sense attributed to it by Justice Story and, at least, is broad enough to include the acts of which the Government complains.

*Decree affirmed.*