The PROCESS GAS CONSUMERS GROUP, and the Georgia Industrial Group, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Fertilizer Institute, Biscuit and Cracker Manufacturers' Association, National Council of Farmer Cooperatives, Eli Lilly and Company, Glass Packaging Institute, Great Western Sugar Company, American Paper Institute, Inc., National Food Processors Association, Intervenors.

No. 82–1999.

United States Court of Appeals, District of Columbia Circuit.

Argued 4 May 1983.

Decided 17 June 1983.

Edward J. Grenier, Jr., Washington, D.C., with whom Richard P. Noland, Robert R. Morrow and David A. Gross, Washington, D.C., were on the brief, for petitioner.

Joanne Leveque, Atty., F.E.R.C., Washington, D.C., with whom Charles A. Moore, Gen. Counsel, and Barbara J. Weller, Deputy Sol., Washington, D.C., were on the brief, for respondent.

Stephen A. Herman, Washington, D.C., with whom Melvin Richter, Donald A. Frederick, Nicholas W. Fels and Keith R. McCrea, Washington, D.C., were on the brief, for agricultural intervenors. Joseph M. Creed, Thomas E. Mitchell and James L. Trump, Washington, D.C., also entered appearances for agricultural intervenors.

Rigdon H. Boykin, New York City, was on the brief for intervenor, American Paper Institute, Inc.

Michael J. Huston and Margaret M. Huff, Indianapolis, Ind., entered appearances for intervenor, Eli Lilly and Co.

Before TAMM and WILKEY, Circuit Judges, and McNICHOLS,* Senior District Judge, United States District Court for the District of Idaho.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This case involves a challenge to a final rule issued by the Federal Energy Regulatory Commission ("FERC" or "the Commission"). The rule defines the extent to which certain agricultural users of natural gas will have priority access to gas in times of shortage. Petitioners are two associations of industrial consumers of natural gas who challenge the rule on a variety of substantive grounds. We affirm the Commission.

## I. BACKGROUND

Title IV of the Natural Gas Policy Act of 1978 (NGPA)[1] establishes priorities of service to be applied by interstate natural gas pipelines in curtailing gas service to pipeline customers during periods of shortage. Section 401(a) provides that the last group to have service curtailed will be certain "high-priority users,"[2] defined to include residences, small commercial establishments, and schools, hospitals, or similar institutions.[3]

Second in line to the pump are "essential agricultural uses." Under section 401(b), these agricultural uses have priority over all except "high-priority users" unless FERC "in consultation with the Secretary of Agriculture, determines, by rule or order, that use of a fuel (other than natural gas) is

economically practicable and that the fuel is reasonably available as an alternative for any agricultural use of natural gas ...."[4]

Section 402(b) of the NGPA gives third place to "essential industrial process and feedstock uses." These uses receive priority over all but "high-priority users" and "essential agricultural uses" provided that "the Commission determines that use of a fuel (other than natural gas) is not economically practicable and that no fuel is reasonably available as an alternative for such use."[5] All remaining gas uses, including those agricultural and industrial process and feedstock uses which do not qualify for their respective priorities, fall below priority three.[6]

Pursuant to its mandate under section 401(b), FERC engaged in a variety of rulemaking proceedings, culminating in a final rule issued on 11 August 1980 as Order No. 55–B.[7] The Commission held that both coal and residual (No. 6) fuel oil are reasonably available and economically practicable alternate fuels for essential agricultural uses of gas. Those agricultural uses which have already installed capacity to use either of those fuels are considered to have alternate fuel capability and are, thus, not entitled to the natural gas priority of section 401. Agricultural uses without the capacity to burn those fuels, even if that capacity could be installed economically, are not considered to have alternate fuel capability.

The Commission also held that middle distillate (No. 2) fuel oil is too expensive to be considered an "economically practicable" alternative to natural gas for essential agricultural uses. Thus, agricultural uses with

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 15 U.S.C. §§ 3391–3394 (Supp. V 1981).

2. 15 U.S.C. § 3391(a).

3. 15 U.S.C. § 3391(f)(2).

4. 15 U.S.C. § 3391(b).

5. 15 U.S.C. § 3392(b).

6. The NGPA establishes only the top three priorities. It does not provide for any priorities below those three. However, under the Department of Energy Organization Act, 42 U.S.C. § 7172(a)(1)(E) (Supp. V 1981), and the Natural Gas Act, 15 U.S.C. § 717 (1976), the Department of Energy and FERC have the authority to establish and implement additional lower curtailment priorities.

7. Reprinted in Joint Appendix (JA) vol. 1 at 195. The rule alone, without the Commission's accompanying statement, is printed at 18 C.F.R. §§ 281.301–281.305 (1982).

the capacity to burn No. 2 oil, but not coal or No. 6 oil, will not lose their natural gas priority.

Applications for rehearing were filed by a number of parties to the proceedings. In Order No. 55–C, FERC denied all issues raised on rehearing.[8] This suit followed.

Petitioners claim to find four flaws in the final rule. First, FERC misinterpreted the term "economically practicable" as used in section 401(b) and, thereby, failed to follow the explicit standard intended by Congress. Second, FERC arbitrarily and capriciously failed to articulate the standard it actually applied to determine when a fuel is an economically practicable alternative to natural gas for agricultural uses. Third, No. 2 fuel oil is an economically practicable alternative to natural gas for agricultural uses, and FERC acted arbitrarily and capriciously in failing so to find. Finally, FERC arbitrarily and capriciously limited its exclusion from the essential agricultural use priority only to those uses with already installed capacity to use coal or No. 6 oil. The Commission should also have excluded those agricultural uses for whom it is economically practicable to install capacity to use these alternate fuels.

## II. Discussion

### A. *No. 2 Oil*

■ Petitioners' first three contentions revolve around a single point: FERC's failure to classify No. 2 oil as an economically practicable alternative to natural gas for agricultural uses will allow those uses capable of burning No. 2 oil to burn natural gas during times of shortage even if that consumption directly results in the partial or total curtailment of gas to industrial process or feedstock uses having no capacity to use an alternate fuel. In other words, to save money with lower cost fuel, agricultural uses will be able to force industrial process or feedstock uses to go partially or even completely without necessary natural gas.

Petitioners allege that this possibility is directly contrary to Congress' intent in providing an "economically practicable" exception to the essential agricultural use priority of section 401. According to petitioners, Congress wanted to insure that "those gas uses which could use an alternate fuel would be curtailed before gas uses protected by either Sections 401 or 402."[9]

The lynchpin of petitioners' argument is that both sections 401 and 402 use the term "economically practicable." The Conference Report on section 402 explains that "[t]he term economically practicable is intended to have the same meaning as the Commission's standard of economic feasibility under extra-ordinary relief in curtailment cases."[10] According to petitioners, the Commission's traditional standard in "extra-ordinary relief in curtailment cases" focuses only on whether a natural gas use either has the capacity to burn an alternate fuel or could economically develop that capacity. It does not consider the cost of the alternate fuel itself. "In determining when an alternative fuel 'could have been utilized,' the Commission has traditionally applied a 'cost of conversion' test—*i.e.,* it has looked to the relative cost to the user of converting its gas-burning equipment to be able to use a non-gaseous fuel."[11] The cost of the non-gaseous fuel itself is left out of account.

Petitioners rely on the general presumption that when Congress uses the same term in two parts of a statute the term has the same meaning in both places.[12] Since

---

8. Order No. 55–C, Order Denying Rehearing (29 June 1982), *reprinted in* JA vol. 1 at 214.

9. Brief of Petitioners at 23.

10. H.R.Rep. No. 95–1752, 95th Cong., 2d Sess. (hereinafter cited as *Conference Report*) at 114, U.S.Code Cong. & Admin.News 1978, 8800, at 9031.

11. Brief of Petitioners at 31.

12. *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 (1932); *Firestone v. Howerton,* 671 F.2d 317, 320 n. 7 (9th Cir.1982); *Fortin v. Marshall,* 608 F.2d 525, 528 (1st Cir.1979). The *Atlantic Cleaners and Dyers* case actually cuts against petitioners, since the Court goes on to note that "the presumption is not rigid and readily yields whenever there is such variation in the connection in which the words are used

Congress apparently meant to rely on FERC's prior practice in defining "economically practicable" in section 402(b),[13] petitioners conclude that FERC was wrong in relying on the high cost of No. 2 oil in deciding that No. 2 oil is not an economically practicable alternate fuel for essential agricultural uses under section 401(b).

The initial flaw in this argument is apparent simply from reading the two sections. Both do contain the term "economically practicable." But the two contexts are different. Section 401(b) emphasizes that the priority applies automatically to essential agricultural uses *unless* FERC affirmatively determines that the use of an alternate fuel is economically practicable. Section 402(b), on the other hand, emphasizes that the priority applies to essential industrial process and feedstock uses "only if" FERC determines that an alternate fuel is *not* economically practicable. In other words, the presumption of section 401(b) is that the priority applies. The presumption of section 402(b) is just the opposite. It seems to follow that Congress did not have in mind that the exact same test would be applied in the same way in both instances. The language of the two provisions at least leaves open the possibility that different tests will be employed under them.

Without expressing any opinion as to the test called for by section 402(b), we conclude that FERC properly interpreted section 401(b). The Conference Report on section 401 states with unmistakable clarity that the cost of an alternate fuel, and not just the cost of conversion to an alternate fuel, is to be considered by FERC.

The Commission determination that an alternative fuel is "economically practicable" shall not include a requirement to switch to high cost alternatives. That is not what the conferees consider to be "economically practicable." [14]

Petitioners' case crumbles in the face of this clear congressional directive. FERC properly took account of the cost of No. 2 oil in deciding that it was not an economically practicable alternate fuel.

The same point helps dispose of petitioners' two related claims. The standard employed by FERC to determine when an alternate fuel is economically practicable is necessarily vague but not invalid on that account. Petitioners complain that "the Commission applied a vague methodology which, in some unspecified manner, took into account the relative prices of natural gas and alternate fuels, the relative prices of the alternate fuels themselves, the likely rate of increase in their relative prices, and projected levels of curtailment."[15] But these are precisely the factors that must be sifted by the Commission and assigned relative values. The task requires expert judgment and considerable experience. Such a delicate weighing and balancing involving numerous technical considerations is not reducible to a simple formula.[16]

Finally, the decision not to classify No. 2 oil as an economically practicable alternative to natural gas for essential agricultural uses is amply supported in the order setting out the final rule.[17] It is for just such difficult choices that we most rely upon

as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." 286 U.S. at 433, 52 S.Ct. at 609. This is just such a case here, where different contexts leave open the possibility of different intents.

13. FERC has not in fact made any determination yet as to the meaning of "economically practicable" in section 402. In the final rule at issue here, the Commission noted that "the meaning of the alternative fuel rule in Section 402 is not before the Commission at this time, and it would be inappropriate to attempt to construe its meaning in the context of this

discussion of Section 401." Order No. 55–B at 25, *reprinted in* JA vol. 1 at 207.

14. *Conference Report, supra* n. 9, at 114.

15. Brief of Petitioners at 30.

16. FERC specifically "decided not to adopt a fixed formula" in order to retain flexibility in the face of potential fluctuations in price and supply. Order No. 55–B at 24, *reprinted in* JA vol. 1 at 206.

17. *See id.* at 5–16, *reprinted in* JA vol. 1 at 197–202.

agency expertise.[18] The line had to be drawn somewhere, and petitioners fail to show that the Commission's decision to draw it at No. 2 oil was in any way arbitrary or capricious. Statistics gathered by the Commission in formulating the final rule, and updated during the period of re- consideration, show that from 1976 through 1981 the price of No. 2 oil ranged from 1.89 to 2.57 times that of natural gas.[19] The next most expensive fuel, low sulphur No. 6 oil, was also costly relative to natural gas, ranging from 1.57 to 2.1 times the cost of natural gas during the same period.[20] But

18. *May Trucking Co. v. United States,* 593 F.2d 1349, 1354 (D.C.Cir.1979); *Home Box Office v.* *FCC,* 567 F.2d 9, 60 (D.C.Cir.1977) (per curiam).

19.

FPC Form No. 423 Price Data *

cents/MMBtu

| Type of Fuel | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|
| Fuel Oil | | | | | | |
| No. 2 | 235.1 | 264.3 | 271.9 | 402.1 | 569.9 | 706.3 |
| Low Sulphur No. 6 | 207.1 | 229.1 | 225.1 | 320.2 | 464.3 | 576.4 |
| High Sulphur No. 6 | 168.7 | 199.9 | 186.7 | 264.7 | 359.3 | 457.1 |
| All No. 6 | 195.9 | 220.4 | 212.3 | 299.7 | 428.1 | 529.0 |
| Coal | | | | | | |
| All Grades | 84.8 | 94.7 | 111.6 | 122.4 | 135.1 | 153.3 |
| Natural Gas | 103.4 | 130.0 | 143.8 | 175.4 | 221.4 | 282.8 |

* As reported in DOE/EIA Energy Data Report entitled *Cost and Quality of Fuels for Electric Utility Plants* (Annual Summary Data 1976–1980) and Monthly Reports for January through December 1981. Note: All prices are delivered prices to steam electric plants. Prices paid for No. 6 fuel oil include prices paid for minor amounts of No. 4 and No. 5 fuel oil, crude and tapped crude.

A different set of statistics shows No. 2 oil ranging from 1.74 to 2.33 times the price of natural gas during the same period.

Monthly Energy Review Price Data *

cents/MMBtu

| Type of Fuel | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|
| Oil | | | | | | |
| No. 2 | 226.4 | 257.3 | 268.2 | 403.1 | 576.8 | 716.0 |
| Low Sulphur No. 6 | 193.6 | 221.3 | 216.8 | 322.4 | 467.0 | 582.6 |
| High Sulphur No. 6 | 165.9 | 195.2 | 186.1 | 261.5 | 351.7 | 457.3 |
| All No. 6 | 182.8 | 210.4 | 202.7 | 297.0 | 415.0 | 518.8 |
| Coal | | | | | | |
| All Grades | 84.8 | 94.7 | 111.6 | 122.4 | 135.1 | 153.3 |
| Natural Gas | 97.2 | 131.9 | 154.1 | 201.8 | 247.8 | 316.5 |

* Fuel oil prices are reported on FEA Form No. P302-M-1, "Petroleum Industry Monthly Report for Product Prices." Natural Gas Prices are those paid by industrial customers of major interstate pipeline companies as reported on FPC Form No. 11, "Natural Gas Pipeline Company Monthly Statement" from 1976 through 1979. Note: Gas prices paid by industrial customers to interstate pipeline companies are no longer reported in EIA's MER. The 1980 natural gas price was taken from the EIA report entitled *Mainline Natural Gas Sales to Industrial Users, 1980* (Dec. 1981); the 1981 gas price is based on the percentage increase in natural gas prices paid by steam electric plants from 1980 to 1981.

Both sets of figures are printed as Appendix A to FERC's Order No. 55–C, Order Denying Rehearing (29 June 1982), *reprinted in* JA vol. 1 at 214, 230.

20. Using the figures from the two cited tables, we can develop the following price comparisons.

the price savings, in a direct comparison of low sulphur No. 6 oil and No. 2 oil, is significant. Using the same figures, we can see that low sulphur No. 6 oil was from 12.1% to 20.4% less expensive than No. 2 oil.[21] Taking both low and high sulphur No. 6 oil into account, the saving is from 16.6% to 25.5%.[22] Furthermore, as FERC has pointed out, No. 6 oil has not increased in price as rapidly as No. 2 oil so that the gap between the two prices is widening.[23]

To repeat, the line had to be drawn somewhere. Under the circumstances, it seems eminently reasonable for FERC to have concluded that No. 6 oil is an economically practicable alternative to natural gas under section 401(b), whereas No. 2 oil is one of the "high cost alternatives" rejected by Congress. At any rate, having no comparable expertise, we decline to redraw the line according to our own notions of what might be best.

## B. *Installed/Installable Capacity*

■ Petitioners' final contention is that FERC erred in failing to require agricultural uses that could do so economically to install capacity to use coal or No. 6 oil. The argument is pitched on the same appeal as that concerning No. 2 oil: Why should industrial process and feedstock uses be forced to shut down completely in face of a shortage when agricultural uses could economically install capacity to burn alternate fuels?

FERC's initial reply to this question appears unresponsive: "the prospect of plant shutdowns was not one taken into consideration at the time of the rule's adoption." [24] Why not, we might well ask, given that the whole point in having a rule is that future curtailments might cause plant shutdowns? Congress wanted to ensure that proper priorities would be observed in just such an eventuality. By ignoring even the possibility of shutdowns, FERC appears to have ignored the intent of Congress in passing the NGPA.

The Commission replies simply that conditions have changed since the enactment of the NGPA. Grave shortages of natural gas have given way over the years to adequate supplies.[25] There is sufficient natural gas now, and FERC predicts that for the foreseeable future any shortages will be minor and brief. Such severe shortages as would cause plant shutdowns are not anticipated. FERC does not want to force the conversion of agricultural uses in response to mild curtailments, judging that it is better to force lower priority uses to take somewhat bigger curtailments (during those rare, brief periods of shortage) so as to spare agricultural uses this expense. The Commission feels that it is thereby acting in accordance with Congress' directive "to pre-

### Percentage of Price of Natural Gas

| | FPC Form No. 423 | | Monthly Energy Review | |
|---|---|---|---|---|
| | No. 2 Oil | Low Sulphur No. 6 | No. 2 Oil | Low Sulphur No. 6 |
| 1976 | 227% | 200% | 233% | 199% |
| 1977 | 203% | 176% | 195% | 168% |
| 1978 | 189% | 157% | 174% | 141% |
| 1979 | 229% | 183% | 200% | 160% |
| 1980 | 257% | 210% | 233% | 188% |
| 1981 | 250% | 204% | 226% | 184% |

**21.** Percentage Saving on Low Sulphur No. 6 over No. 2 Oil

| | FPC Form No. 423 | Monthly Energy Review |
|---|---|---|
| 1976 | 12.1% | 14.5% |
| 1977 | 13.5% | 14% |
| 1978 | 17.2% | 19.2% |
| 1979 | 20.4% | 20% |
| 1980 | 18.5% | 19% |
| 1981 | 18.4% | 18.6% |

**22.** Percentage Saving on All No. 6 over No. 2 Oil

| | FPC Form No. 423 | Monthly Energy Review |
|---|---|---|
| 1976 | 16.7% | 19.3% |
| 1977 | 16.6% | 18.2% |
| 1978 | 21.9% | 24.4% |
| 1979 | 25.5% | 26.3% |
| 1980 | 24.9% | 28.1% |
| 1981 | 25.1% | 27.5% |

**23.** Order No. 55–B at 15, *reprinted in* JA at 202.

**24.** Brief for Respondent at 26–27.

**25.** *See* Order No. 55–B at 13, *reprinted in* JA

vent unnecessary increases in the cost of food in this country." [26]

Petitioners complain that at least for large boilers it is very inexpensive on a per Btu basis to convert to oil use.

> Since it is likely that, on a per unit basis, the cost of conversion for large agricultural boilers is no greater than the periodic fluctuations in the cost of No. 6 oil, there is no basis for FERC's conclusion that the mere fact that there are any conversion costs *per se* render[s] the use of No. 6 oil economically impracticable for those large agricultural boilers without installed capacity to burn No. 6 oil.[27]

But petitioners' objection is really beside the point. It may well be true that the cost of conversion of a large boiler works out over time to a small amount per Btu relative to the cost of No. 6 oil. But that is on the assumption that the boiler would be burning No. 6 oil on a regular basis. And it is precisely that assumption which FERC disputes.

No. 6 oil is more expensive than natural gas. Agricultural uses, whether or not they have the capacity to burn No. 6 oil as well as natural gas, will obviously save money by using natural gas whenever it is available. FERC's key point, which petitioners fail to refute, is that natural gas is now, and will probably continue to be, freely available. Therefore, the installation of alternate capacity is an unnecessary expense to impose on agricultural uses. Only in rare instances, given current predictions, would they have to have recourse to that capacity because of natural gas curtailments.

Those rare instances, and the possibility of longer, more severe curtailments, might be sufficient to convince agricultural uses to install alternate capacity if FERC took away their priority. But given FERC's predictions as to supply and the congressional directive to avoid unnecessary costs to agri-

cultural uses, it seems reasonable for FERC to leave the priority intact and save agricultural uses the cost of conversion. The question, again, is one calling for judgments of degree informed by technical expertise, and Congress entrusted those judgments to the Commission.

On a broader level, one may question the wisdom of FERC's unwillingness to formulate now, when there is time for reflection, the rules and standards that would apply during a sudden and severe shortage. If, for example, a domestic natural gas shortage were to correspond with serious trouble abroad affecting the supply of imported fuel oil, the combined impact could be both swift and devastating. The Commission claims that it stands ready "to reconsider the final rule adopted herein as changed circumstances may require, even though it is established as a final rule." [28] But the speed of administrative agency action does not give confidence that the necessary rules would be put into place in sufficient time to avoid serious problems of priorities in the use of natural gas.

Despite these doubts, we see no choice but to affirm the final rule issued by the Commission. Our powers of substantive review are slight, and the final rule issued by the Commission cannot be found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [29]

Accordingly, the petition of the industrial consumers of natural gas is denied, and the orders of the Commission establishing the final rule and denying rehearing are

*Affirmed.*

---

vol. 1 at 201.

**26.** *Conference Report, supra* n. 9, at 114.

**27.** Reply Brief of Petitioners at 18.

**28.** Order No. 55–B at 24, *reprinted in* JA vol. 1 at 206.

**29.** 5 U.S.C. § 706(2)(A) (1976).