In the Matter of MERCHANTS GRAIN, INCORPORATED, By and Through receiver, Edmund M. MAHERN, Debtor.

Appeal of Edmund M. MAHERN, Trustee for Merchants Grain, Incorporated.

No. 95–2625.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1996.

Decided Aug. 27, 1996.

Joseph H. Yeager, Jr. (argued), James M. Carr, Wendy W. Ponader, Baker & Daniels, Indianapolis, IN, for Edmund M. Mahern, Merchants Grain, Incorporated.

J. Anthony Logan, Wright & Logan, Dublin, OH, for Mark Atkins, Chris Atkins, Charles Dresbach & Son, Gary Graham, John Perry, Larry Starling, Linda Andrews, Larry Augenstein, Robert Belt, Candlehill Farm, Robert Thomas, William Thomas, Jr., Scott Dever.

John Perry, Delaware, OH, pro se.

Brian Shonk, Lancaster, OH, for Phil Leitnaker.

Dave Shade, Delaware, OH, for Ohiogro, Incorporated.

John Timmons, Lockbourne, OH, pro se. John Street, Chillicothe, OH, for Herron Farms.

Rankin M. Gibson, Columbus, OH, for Rene Schreck.

Richard T. Ricketts, Michelle T. Sutter, Ricketts & Onda Company, Columbus, OH, for Dick Brenner.

William B. Logan, Jr. (argued), Kenneth M. Richards, Luper, Wolinetz, Sheriff & Neidenthal, Columbus, OH, for Ohio Agricultural Fund.

Kenneth M. Richards, Luper, Wolinetz, Sheriff & Neidenthal, Columbus, OH, Cheryl Minsterman (argued), Ohio Department of Agriculture, Reynoldsburg, OH, for Ohio Department of Agriculture.

Glen Elfrink, Hilliard, OH, pro se.

Jack Utzinger, Grove City, OH, pro se.

Before CUMMINGS, BAUER, and MANION, Circuit Judges.

MANION, Circuit Judge.

The bankruptcy trustee for Merchants Grain, Inc. filed this action to recover payments made to farmers for the sale of their grain and to include those payments in the bankruptcy estate. The bankruptcy court and the district court ruled for the farmers. We affirm.

## I.

Before it filed for bankruptcy on May 9, 1991, Merchants Grain, Inc. ("MGI") owned and operated grain storage and marketing facilities in six states, including one in Ohio. The Ohio facility located in Columbus, was a grain terminal facility providing both storage and transportation facilities. It had significantly more storage capacity than a typical grain elevator facility and was one of only two facilities of its capacity servicing central Ohio.

MGI offered several types of grain marketing contracts to farmers. In one of these, a delayed pricing contract, the farmer delivers grain to the elevator at harvest time but is not immediately paid for it. Instead, on a later date specified by the farmer, the elevator places the grain on the market and sells it at the going price. After subtracting the elevator operator's share, the proceeds from the sale are transferred to the farmer. Of course an elevator operator cannot differentiate one farmer's grain from another's; the grain itself is fungible. The elevator simply owes the farmer for the quantity of grain deposited. The defendants in this case were all farmers who had delivered grain to MGI under a delayed pricing agreement.

Among other provisions, the delayed pricing agreement between MGI and grain depositors stipulated that title to the grain transferred to MGI upon delivery and that the depositor became a "common creditor" for the value of the grain. However, the contract alone did not define the entire relationship between MGI and the depositors at its Columbus, Ohio facility. State law also governed the grain transactions.

Ohio provides additional protection to farmers who market grain through Ohio grain elevators and terminals. Among those protections, Ohio law creates a statutory lien on the grain on behalf of the grain depositor. Ohio Rev.Code § 926.021. In addition, Ohio grants its Department of Agriculture and its Director of Agriculture specific powers to regulate, license, and otherwise oversee the operations of grain storage and marketing facilities. Such facilities that are engaged in the business of agricultural product handling are referred to in the Ohio statutes as "agricultural commodities handlers." *See* Ohio Rev.Code § 926 *et seq.* (regulating agricultural commodity handlers). Included in its oversight authority the Director has the power to revoke, suspend, or conditionally suspend the license of an agricultural commodity handler that does not maintain statutorily sufficient assets to cover the outstanding receipts for grain deposits. Ohio requires agriculture commodities handlers to maintain a positive current net worth based on a formula involving the grain deposits over the preceding 12–month period. Ohio Rev.Code § 926.06(B).

As part of its oversight function, the Department of Agriculture reviewed MGI's financial statements, which in early September, 1990, revealed a negative current net worth of over $6,000,000. Rather than suspend MGI's license to operate its Ohio facility, the Department extended MGI several options for rectifying the violation. Although MGI and the Department exchanged correspondence over the next several months, MGI did not resolve its financial problem. The Department did not wish to suspend MGI's license because the fall grain harvest was under way and MGI's facility was vital to the central Ohio agricultural community. Without a facility to store grain for delayed pricing contracts, grain producers would be

forced to cash-sale their grain at harvest time resulting in significantly lower prices and serious financial losses.

By November 8, 1990, MGI still had not complied with the statutory financial requirements and the Director of Agriculture conditionally suspended MGI's agriculture commodity handler's license pursuant to Ohio Rev.Code § 926.10. The conditional suspension restricted MGI's Columbus, Ohio operation but permitted the facility to continue acquiring grain deposits. The Department required MGI to cover 100 percent of all grain obligations either with grain on hand or cash deposited in a segregated bank account located in Ohio. Between November and mid-December, the Department of Agriculture increased its oversight of MGI.

In late December, 1990, MGI issued a check to the federal government which was returned due to insufficient funds. When the Department was notified of this development, it immediately initiated a full examination of MGI's grain records and inventories. Before the Department completed its examination, MGI closed the Columbus facility, which at that time had close to one million bushels of grain on deposit.

On January 7, 1991, the Director fully suspended MGI's license. The Department of Agriculture and MGI thereafter reached a settlement agreement under which MGI was permitted to continue operating its Columbus facility under Department oversight of its day-to-day operations in order to sell the grain it had on deposit. The proceeds from the grain sales were deposited in one of three joint escrow accounts on which checks could be drawn only if they were signed by both the Department and MGI. While the agreement permitted MGI to sell the grain it had on deposit, it required MGI to consult with the Department regarding the sale price. The Department arranged for all grain depositors with delayed price contracts to accept payment terms providing the market

price on the day of sale as their contract price. The Department verified the number of bushels credited to each depositor and the amount of money owed based on that credit, the negotiated sales terms, and the resulting sales price. The Department credited MGI with its operating margin on the sale of the grain before paying the grain depositors.

Under Department of Agriculture oversight, MGI successfully sold 975,000 bushels of grain, collecting into the escrow accounts sufficient funds to pay its grain depositors. After paying the depositors, the Department on June 24, 1991 released over $135,000 (and over $324,000 worth of grain) to MGI, which had filed for Chapter 11 bankruptcy on May 9, 1991.

The bankruptcy trustee for MGI ("trustee") filed this action in federal bankruptcy court to avoid and bring back into the bankruptcy estate, under § 547(b) of the federal Bankruptcy Code, 11 U.S.C. § 547, those funds transferred from MGI to the depositors within the ninety days preceding MGI's May 9, 1991 bankruptcy "petition date."[1] The grain depositors maintained that due to the valid statutory agricultural commodity lien, MGI had no "interest" in the grain and that, in any event, the funds transferred to them for their grain deposits were no more than they would have received had the distribution been made through bankruptcy, either point preventing avoidance under § 547(b). The trustee argued that the Ohio statutory lien was avoidable both under § 545(1) of the Bankruptcy Code because it became effective only when MGI became insolvent, and under § 545(2) because it was not perfected against a bona fide purchaser on the date MGI filed for bankruptcy.

The bankruptcy court entered summary judgment for the farmers, concluding that under Ohio Revised Code § 926.021 the farmers had a valid lien on the grain which arose upon delivery of the grain by the farm-

---

1. The trustee also separately sued the Ohio Agricultural Commodity Fund and Ohio Commodity Advisory Commission. We upheld application of the U.S. Bankruptcy Code against the state. *In re Merchants Grain, Inc.,* 59 F.3d 630 (7th Cir. 1995). However, the Supreme Court granted certiorari, —— U.S. ——, 116 S.Ct. 1411, 134 L.Ed.2d 537 (1996), and remanded the case to this court to determine whether our decision is still valid following *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). That case was stayed June 27, 1996, pending the outcome of this appeal.

ers to MGI. The court determined that the lien created by Ohio Rev.Code § 926.021 was a statutory lien pursuant to the Bankruptcy Code and could be avoided by the trustee only through application of § 545 subsections (1) or (2).

The bankruptcy court concluded that neither subsection permitted the trustee to avoid the agricultural commodity liens arising under § 926.021. First, the liens could not be avoided under § 545(2) because the property to which they had attached was not in MGI's possession on the date it filed for bankruptcy. Because § 545(2) gives the trustee the powers of a bona fide purchaser "at the time of the commencement of the case," and because there was no longer any property over which the bona fide purchaser might assert his rights, the bankruptcy court concluded § 545(2) was inapplicable.

The bankruptcy court next determined that the trustee could not avoid the liens pursuant to § 545(1). Because Ohio Rev. Code § 926.021 states that the lien "shall arise at the time of the delivery of the agricultural commodity for sale ...," the lien first became effective upon delivery of the grain to MGI. The bankruptcy court rejected the trustee's argument that by the terms of the Ohio statute the lien first became effective upon insolvency of the debtor, which the trustee argued would permit the trustee to avoid the lien pursuant to § 545(1). The bankruptcy court concluded that because the lien could not be avoided pursuant to either subsection of § 545, the funds transferred to the farmers were payments on a secured debt and were not subject to avoidance under § 547(b).

The trustee appealed the decision to the district court which affirmed on essentially the same grounds the bankruptcy court had used to reach the initial decision. The district court concluded that the Ohio statute created a lien on grain deposits which removed the grain and its proceeds from being considered property of the debtor. As such, its transfer would not constitute an avoidable transfer under § 547(b), which permits avoidance of transfers of "an interest of the debtor in property." The court rejected the trustee's argument that the lien could be

avoided under § 545(1) as a lien that first became effective upon the insolvency of the debtor. Analyzing the Ohio code, the district court reached the same conclusion as had the bankruptcy court below: the lien created by Ohio Rev.Code § 926.021 became effective at the time of the delivery of the grain to the grain handler. The district court also concluded, as had the bankruptcy court, that because § 545(2) evaluates a statutory lien against a hypothetical bona fide purchaser at the time the debtor filed for bankruptcy, and because the grain had been sold, the farmers paid, and the liens extinguished by that date, § 545(2) could not be used to avoid the lien. Finally, the court noted that even had the lien still existed at the time of bankruptcy, it would have been enforceable against a bona fide purchaser pursuant to Ohio law. The trustee appeals.

## II.

■■■ We review *de novo* both the bankruptcy court's and the district court's conclusions of law. *In re Forum Group, Inc.*, 82 F.3d 159, 162–63 (7th Cir.1996). We accept the bankruptcy court's conclusions of fact unless they are clearly erroneous. *Id.*

*Bankruptcy Code Section 547*

The trustee seeks to "avoid"—that is, to get back—the money transferred to the farmers before MGI filed for bankruptcy on May 9, 1991. The mechanism for doing so is found in 11 U.S.C. § 547, Bankruptcy Code ("Code"), § 547. Section 547 permits the trustee to avoid certain transfers made before the filing of bankruptcy:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made—(A) on or within 90 days before the date of the filing of a petition; ... (5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title [11 U.S.C. §§ 701 et seq.]; (B) the transfer

had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title [11 U.S.C. § 1 et seq.].

11 U.S.C. § 547.

All five elements must be present for the trustee to avoid a transfer under § 547(b). *Barash v. Public Finance Corp.*, 658 F.2d 504, 507 (7th Cir.1981). Two elements are of concern to this case: (1) whether the transfers were interests in the debtor's property, as required by the preamble to § 547(b), and (2) whether the transfers permitted the creditors, in this case the farmers, to receive more than they would have through the bankruptcy proceeding if the transfers had not been made as required by the fifth element.

The trustee asserts that the payments made by MGI and the Director to the grain depositors were transfers of MGI's interest in property and that, as general creditors, the farmers would not have received the transfers had they stood in line for payment along with all the other unsecured creditors.

The grain depositors argue that neither element is met. First, the Ohio statutory lien[2] on the grain prevented the transfers from constituting transfers of an "interest of the debtor [here MGI] in property." Second, the same lien placed the grain depositors in the position of secured lienholder creditors who, collecting ahead of unsecured general creditors, would have received the transfers through bankruptcy distribution in any event.

■ The Code does not define "an interest of the debtor in property." "Generally, property belongs to the debtor for purposes of § 547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors." *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). In *Begier v. I.R.S.*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), the Supreme Court concluded that the term "property of the debtor" was coextensive with "interests of the debtor in property" as used in 11 U.S.C. § 541(a)(1). *Id.* at 59 n. 3, 110 S.Ct. at 2263 n. 3. Section 541(d) clarifies § 541(a) by providing that "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." Thus, the interest of the debtor in property "is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Id.* at 58, 110 S.Ct. at 2263.

■ A lien is a property right, *Armstrong v. United States*, 364 U.S. 40, 46, 80 S.Ct. 1563, 1567, 4 L.Ed.2d 1554 (1960); *In re Penrod*, 50 F.3d 459, 462 (7th Cir.1995), and the Code looks to state law to determine the extent of that interest. *In re Freedom Group*, 50 F.3d 408, 410 (7th Cir.1995) (citing *Barnhill v. Johnson*, 503 U.S. 393, 397–98, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992); *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 370, 65 S.Ct. 405, 408, 89 L.Ed. 305 (1945)). If the Ohio statutory lien on grain deposits was valid under Ohio law, and not avoidable under the Code, it would deprive MGI, the debtor, from holding equitable interest in the grain to which it held paper title. The lien would prevent the grain in question, or the proceeds from that grain, from being considered an interest of the debtor in property subject to avoidance under § 547(b). Likewise, if the Ohio statutory liens were valid under Ohio law and not avoidable by the Code, they would create secured creditor status for the grain depositors which would entitle them to be paid before general creditors under bankruptcy laws governing distribution of the bankruptcy estate. *Barash, supra*, at 509; *see, also, In re Hagen*, 922 F.2d 742, 746 (11th Cir.1991) ("A transfer to

---

**2.** A statutory lien is a lien "arising solely by force of a statute on specified circumstances or conditions." 11 U.S.C. § 101(53).

a secured creditor in the amount of its lien does not constitute an avoidable preference."); *Deel Rent–A–Car, Inc. v. Levine,* 721 F.2d 750, 756 (11th Cir.1983) ("The fact that one creditor is paid in full from a source to which other creditors have no right ... does not entitle ... the trustee to recover the amount so secured.") (quoting *Walker v. Wilkinson,* 296 F. 850, 852 (5th Cir.1924)). The trustee's ability to employ § 547(b) to avoid the transfers rises or falls on whether the lien created by Ohio statute was both valid under state law and not prohibited under the Code.

*The Ohio Statute*

 Ohio's statutory lien on grain deposits is found in Chapter 926, the portion of its agricultural code dealing with "Agricultural Commodity Handlers." Specifically, the language creating the lien is found in a portion of the agriculture commodity handlers' code immediately following the statute that sets out the powers of the Director of Agriculture:

Sec. 926.02 **Powers of director of agriculture.**

The director of agriculture shall administer this chapter . . . .

[sec. 926.02.1] § 926.021 **Liens on agricultural commodity assets of failed handler; priority.**

(A) [definitions]

(B) A lien shall exist on all agricultural commodity assets of a failed agricultural commodity handler in favor of any of the following:

(1) Claimants including lenders, who possess receipts covering grain owned or stored by the handler;

(2) Claimants who possess written evidence of ownership other than a receipt disclosing a storage obligation of the handler, including tickets;

(3) Claimants who surrendered receipts as part of an agricultural commodity sales transaction but were not fully paid for the agricultural commodity and the handler failed within twenty days after the surrender;

(4) Claimants who possess any other written evidence of the sale of agricultural commodities to the failed handler for which they were not fully paid.

(C) The lien which shall secure all claims described in division (D) of this section, shall arise at the time of the delivery of the agriculture commodity for sale, ... and shall terminate when the liability of the agricultural commodity handler to the claimant is discharged, provided that the priority of each lien among the respective claimants shall not relate to the date the claim arises but shall be governed by the priorities established in division (D) of this section. The lien claims of all claimants shall be considered to be assigned by operation of this section to the department of agriculture, and in the event of a failure and subsequent liquidation, the lien shall transfer over to assets or proceeds of assets either received or liquidated by the department of agriculture.

(D) In the event of a failure, the director of agriculture shall enforce the lien claims and allocate the proceeds as follows:

(1) First priority against all agricultural commodity assets shall be the following:

(a) Claimants, including lenders, who posses receipts covering grain owned or stored by the agricultural commodity handler;

(b) Claimants who posses written evidence of ownership other than receipts disclosing a storage obligation of the handler

. . . .

 This statute explicitly creates a lien on grain deposits. But the critical issue in this case is the point at which the liens attached to the grain. To determine when the liens attached, we consider the text of the statute. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself.") We examine the statute according to the conventional rules of statutory construction: absent statutory definitions, we accord words and phrases their ordinary and natural meaning and avoid rendering

them meaningless, redundant, or superfluous; we view words not in isolation but in the context of the terms that surround them; we likewise construe statutes in the context of the entire statutory scheme and avoid rendering statutory provisions ambiguous, extraneous, or redundant; we favor the more reasonable result; and we avoid construing statutes contrary to the clear intent of the statutory scheme. *See e.g., Trustees of Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Leaseway Transp. Corp.,* 76 F.3d 824, 828 (7th Cir.1996); *Welsh v. Boy Scouts of America,* 993 F.2d 1267, 1269, 1272–73 (7th Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993); *United States v. Hayward,* 6 F.3d 1241, 1245–46 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); *United States v. Franz,* 886 F.2d 973, 977–78 (7th Cir.1989).

The trustee argues the phrase in division (B)—"a lien shall exist on all agricultural commodity assets of a failed agricultural commodity handler"—instructs that the lien becomes effective upon "failure," which includes insolvency. We disagree. On the simplest level, "shall exist" does not mean "shall become effective." "Exist" implies "to continue in being." Oxford English Dictionary (2d Ed.1989). And "continue in being" implies preexistence. Thus, a plausible plain meaning of division (B) is that a preexisting lien shall continue on agricultural commodity assets of a failed agricultural commodity handler.

This reading of division (B) is confirmed by division (C) which states that "the lien . . . shall arise at the time of the delivery of the agriculture commodity for sale." "Arise" commonly means "originate," "result from," and "come into existence." *Id.* This confirms that the lien comes into existence upon delivery of grain to the agriculture commodity handler and preexists any insolvency of the agricultural commodity handler (unless of course it is delivered after the filing of bankruptcy, which was not the case here).

This reading is consistent with the statutory scheme as a whole. The statute charges the Director of Agriculture with the enforcement of certain liens on agriculture commodities. Division (B) instructs the Director to enforce liens that already exist in favor of certain types of grain depositors, including those who have receipts or other evidence of deposits for sales, storage, or some other transaction. Division (C) sets out how and when the liens are created ("shall arise at the time of the delivery") and how and when they are extinguished ("shall terminate when the liability of the agricultural commodity handler to the claimant is discharged"). Finally, division (D) instructs the Director how to allocate claims among the grain depositor claimants, based on the strength of the receipt they hold (claimants with receipts first, claimants with written evidence other than receipts next, etc.).

The trustee disagrees, arguing that division (B) creates the lien and division (C) merely creates a relation-back date for consideration of statutory liens vis-a-vis other liens, while division (D) allocates priority among holders of agriculture commodity liens arising under this statute. We do not disagree that by creating a statutory lien that arises on deposit, division (C) would assist in setting priorities between one type of secured lien and another. But this effect does not override the clear statutory purpose of division (C). The statute is not concerned with the relationship between statutory grain liens and other liens. The trustee's reading renders division (C) extraneous insofar as the statute instructs the Director to enforce agricultural liens. After all, the Director is not charged with enforcing all liens against a failed agricultural commodity handler, only those liens described in paragraph (B) that are valid pursuant to paragraph (C). By its very terms, the import of division (C) is that the liens the Director is directed to enforce in division (B) (in the priorities dictated by division (D)) are those liens that are in effect—those that arose on delivery and would terminate on discharge

Ohio's lien-creating statute, read in its entirety and in a manner that does not render any portion meaningless, redundant, or superfluous, creates a lien that arises upon delivery of the grain commodity to the handler. It arises simultaneously with delivery

and is only extinguished when liability for the grain has been discharged, that is, when the depositor has been paid. Thus, by statute, the grain handler cannot possess a property interest in grain deposits free from the Ohio agricultural commodity lien unless the lien has been extinguished by payment.

The statute is silent on perfection. The trustee argues that because the lien cannot be perfected it cannot become enforceable. Ohio's other agricultural lien statutes create a similar lien on agricultural products other than grain which requires perfection in order to be valid against a commodity handler. *See, e.g.*, Ohio Rev.Code §§ 1311.55–57 (1991); *In re Peter J. Schmitt Co., Inc.*, 154 B.R. 47, 50–51 (Bankr.D.Del.1993) (discussing Ohio non-grain (cheese and whipped cream) agricultural liens and perfection requirements). Grain deposits are explicitly excluded from that statue, however, and thus are not subject to its perfection requirement. Ohio Rev.Code § 1311.55(A)(1) (lien applies to agricultural commodities other than grain commodities covered in chapter 926). The liens were enforceable under Ohio law without formal perfection, as this case illustrates. The Ohio Director of Agriculture enforced the lien claims and allocated the proceeds of the grain sales to the grain depositors pursuant to the statute.

The grain on deposit at the MGI Columbus facility arrived at that facility with a valid lien attached to it pursuant to Ohio statute. The lien was for the value of the grain as dictated by the contract with the handler. Thus, it could only terminate once "the liability of the agricultural commodity handler to the claimant [was] discharged." § 926.021(C). In this case, the depositors were "delayed pricing agreement" depositors whose contracts called for sale and payment on a future date. The contracts were renegotiated by the Director pursuant to the Department's administration of the liens, and the grain was sold in conformity with the new contracts. It appears that, as a result, the grain was sold sooner than it would have been otherwise. In any event, the record indicates that before

paying the grain depositors for their grain, the Director credited to MGI its operating margin on the sales. The Director transferred to MGI (or its bankruptcy estate) over $459,000 in cash and grain remaining after enforcement of the liens, however the record does not indicate the extent to which that either failed to meet or exceeded the margin that would have been due to MGI had it still been licensed to operate.

Insofar as Ohio law creates and maintains a lien on the grain deposits, it creates a property interest in the grain, *see In re Penrod,* 50 F.3d at 462 (lien is property interest), *In re Freedom Group,* 50 F.3d at 410 (state law defines property interests), that does not pass to the handler until the handler pays the depositor. § 926.021(C). In Ohio, the Director enforces that property interest on behalf of the grain depositor who holds the interest pursuant to the statute. § 926.02 ("The director of agriculture shall administer this chapter...."); § 926.021(D) ("In the event of a failure, the director shall enforce the lien claims...."). Thus the handler receives title to the grain but no legal, equitable, or property interest beyond the title until the lien is extinguished. The liens unquestionably had not been extinguished at the time the Director enforced them on behalf of the farmers. There is also no dispute that the Director had authority pursuant to state law to enforce the liens. There is, in fact, no dispute that the liens existed.[3]

The Ohio statutory lien on the grain deposits therefore prevents the trustee from meeting the necessary elements of § 547(b). The grain deposits that were sold by the Director within the 90–day period preceding MGI's filing for bankruptcy were never "an interest of the debtor in property." MGI never held an interest in the property that was not subject to the lien which arose upon delivery. However, the trustee argues he seeks to avoid the transfers, not by application of 547(b) directly, but by applying § 547(b)'s 90–day rule to § 545's power to avoid the fixing of a statutory lien.

---

**3.** Counsel for the trustee acknowledged as much before the bankruptcy court on October 5, 1994. "It is a lien. I don't think there's much dispute about that. But for the reasons that Mr. Ceryak

will go into, it is avoidable under 545(1) and under 545(2)." The trustee pursues the same argument on appeal.

*Section 545*

■ Section 545 states:

The trustee may avoid the fixing of a statutory lien on property of the debtor to the extent that such lien—

(1) first becomes effective against the debtor—

. . . . .

(D) when the debtor becomes insolvent

(E) when the debtor's financial condition fails to meet a specified standard;

. . . . .

(2) is not perfected or enforceable at the commencement of the case against a bona fide purchaser that purchases such property at the time of commencement of the case, whether or not such a purchaser exists; . . . .

11 U.S.C. § 545

The trustee argues application of § 545, either (1) or (2), permits the avoidance of the Ohio liens. The trustee, the farmers, both courts below, and many other court decisions we have reviewed assume the relevance of this statute to avoiding liens.[4] We cannot agree.

Section 545 permits the trustee to avoid, not "a statutory lien," but "the *fixing* of a statutory lien." The Code does not define the phrase "fixing of a statutory lien," and we have found no cases defining the phrase in relation to § 545. However, the Supreme Court has considered the same phrase in detail in its consideration of Code § 522(f) in *Farrey v. Sanderfoot*, 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991). Like § 545, § 522(f) addresses the avoidance of the *"fixing* of liens," not the avoidance of liens. The Supreme Court carefully analyzed the statutory language common to both § 522(f) and § 545:

No one asserts that the two verbs underlying the provision possess anything other than their standard legal meaning: "avoid"

meaning "annul" or "undo," see Black's Law Dictionary 136 (6th ed. 1990); H.R.Rep. No. 95-595, pp. 126-127 (1977), U.S.Code Cong. & Admin.News 1978 p. 5787, and "fix" meaning to "fasten a liability upon," Black's Law Dictionary, *supra*, at 637. The statute does not say that the debtor may undo a lien on an interest in property. Rather, the statute expressly states that the debtor may avoid "the fixing" of a lien on the debtor's interest in property. The gerund "fixing" refers to a temporal event. That event—the fastening of a liability—presupposes an object onto which the liability can fasten. The statute defines this pre-existing object as "an interest of the debtor in property." Therefore, unless the debtor had the property interest to which the lien attached at some point *before* the lien attached to that interest, he or she cannot avoid the fixing of the lien under the terms of § 522(f)(1).

500 U.S. at 296, 111 S.Ct. at 1829 (emphasis in original).

■ This reading of the statutory language applies to § 545 as well as it does to § 522(f)(1). "There is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204 (1932). *See also, Gustafson v. Alloyd Co., Inc.*, —— U.S. ——, ——, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1 (1995) (same). Moreover, the decision itself cited § 545 for the proposition that other provisions of the Code indicate Congress intended "fixing" to mean a temporal event. *Farrey*, 500 U.S. at 296 n. 3, 111 S.Ct. at 1829 n. 3.

As the Supreme Court discussed in *Farrey*, Congress' revision of the Code to permit a debtor to avoid the fixing of some statutory liens under 11 U.S.C. § 545 was an exception to the general principle that valid liens ob-

---

**4.** *See, e.g., In re Walter*, 45 F.3d 1023, 1027 (6th Cir.1995) ("Section 545 of the Bankruptcy Code dictates when a trustee can avoid statutory liens."); *In re Loretto Winery Ltd.*, 898 F.2d 715, 717-18 (9th Cir.1990) ("Section 545 of the Bankruptcy Code, 11 U.S.C. § 545, dictates when a trustee can avoid a statutory lien."); *In re Woods*

*Farmers Cooperative Elevator Company*, 946 F.2d 1411, 1413 (8th Cir.1991) ("[Section 545 of the] Bankruptcy Code allows the bankruptcy trustee to avoid certain statutory liens."); *In re LMS Holding Co.*, 50 F.3d 1526, 1527 (10th Cir.1995) (analyzing § 545(2) as a lien avoidance provision).

tained before bankruptcy survive bankruptcy and could be enforced on property exempt from bankruptcy distribution. *Id.* at 297, 111 S.Ct. at 1829.

Because the lien for the full amount of grain deposited arose contemporaneously with delivery, the lien attached (was "fixed") before MGI held any interest in the grain. MGI acquired the grain subject to the statutory lien. Therefore, MGI held nothing the trustee could prevent a lien from "fixing" upon under § 545(1) or (2). "[U]nless the debtor had the property interest to which the lien attached ... before the lien attached to that interest, he or she cannot avoid the fixing of the lien...." *Id.* at 296, 111 S.Ct. at 1829. Thus the lien was not avoidable under § 545.

We recognize, as did the Supreme Court in *Farrey,* that the analysis pursuant to § 545 parallels that used to determine whether the debtor has an interest in the property to begin with. It is the same analysis discussed above in our determination that the Ohio statutory lien prevented MGI from possessing an interest in the grain under § 547(b). It is a temporal analysis. If the lien had been fixed on property of the debtor, that is on the property of MGI, then depending upon when it became effective it may have been avoidable by the trustee. While the fixing of a lien is a transfer in itself, the fixing of a lien may not be avoided by the 547(b) 90–day provision. Section 547(c)(6) states: "The trustee may not avoid under this section a transfer ... (6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title...." This section thus limits the trustee's authority to employ the § 547(b) 90–day provision to avoid the "fixing of a statutory lien." By the terms of § 547(c)(6), that limit is sequential to the authority of the trustee under § 545 to avoid the fixing of the lien. Thus, in considering statutory liens under § 545, we must do so without benefit of the 90–day avoidance provided by § 547(b).

All of which means the trustee must challenge a statutory lien first by application of § 545 which permits the trustee to avoid the fixing of certain types of liens. If the fixing of the lien is not avoidable under that section alone, the trustee may not apply the § 547(b) 90–day rule to avoid the fixing of the lien. However, if the fixing of the lien is avoidable under § 545, the trustee may apply the 90–day provisions to recoup any transfers made pursuant to the avoidable lien. *Cf.* Collier on Bankruptcy 547.14 n. 4 (sec. 547(b) does not prohibit trustee from avoiding transfers in satisfaction of a lien, only the fixing of a lien).

■ We have also considered the trustee's argument that the Ohio lien prefers Ohio farmers at the expense of out-of-state farmers and creditors and found it without merit. The Ohio statute is nondiscriminatory on its face. It protects depositors of grain in Ohio grain elevators equally, no matter from what state they come. That MGI Columbus was located almost in dead center of the state creates the factual anomaly that only Ohio farmers had grain on deposit. We would expect an elevator facility located near any of Ohio's borders with surrounding farm states to contain grain deposits from out-of-state farmers who would enjoy the same statutory protection as all other grain depositors utilizing the facility. To the extent the agricultural lien statute creates a secured interest in grain deposits in Ohio grain facilities, that interest disadvantages all unsecured creditors equally, both in and outside Ohio. The Code is not inherently hostile to state statutes creating agricultural or other producer liens. "Statutory liens in favor of such beneficiaries as contractors, mechanics, and materialmen secure persons who have contributed to an enhancement of the value of the debtor's estate, and to withhold protection of such liens in bankruptcy cases would give a windfall to the other creditors." 4 Collier on Bankruptcy para. 545.01, at 545–6, as quoted in *In re Loretto Winery Ltd.,* 898 F.2d 715, 721 (9th Cir.1990) (commenting on California's agricultural lien on grapes). The statute's benefits to Ohio farmers at the expense of out-of-state creditors is only incidental and does not create any unconstitutional preference to one state's citizens at the expense of another's. *See Oregon Waste Systems Inc. v. Department of Environmental Quality of State of Or.,* 511 U.S. 93, ——, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) (nondiscriminatory regulation valid unless burden on

interstate commerce clearly excessive in relation to local benefits.).

### III.

To summarize, the lien at issue in this case fixed upon the grain upon delivery when it was deposited. This prevented MGI from holding a property interest in the grain that would permit the trustee to avoid pursuant to § 547(b) the transfer of the grain proceeds to the farmers within the 90–day period preceding bankruptcy. Because the transfers were payments on a secured debt they could not be avoided under § 547(b). The trustee may not avoid the lien pursuant to § 545 because that section prevents not the avoidance of liens but the avoidance of the fixing of liens on property that is already the debtors'. The farmers in this case were paid out of the proceeds of the sale of the grain on which the lien had fixed upon deposit. The grain was never the property of MGI prior to the fixing of the lien and the trustee may thus not avoid the fixing of the lien or the transfers in satisfaction of the lien.

Accordingly, the district court opinion is AFFIRMED.