Robert F. KESSEL, Appellant,

v.

Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.

No. 98–772.

United States Court of Appeals for Veterans Claims.

Argued July 28, 1999.

Decided Sept. 20, 1999.

Richard P. Cohen for appellant.

Todd A. Sinkins, with whom Leigh A. Bradley, General Counsel; Ron Garvin, Assistant General Counsel; Joan Moriarty, Deputy Assistant General Counsel; Mary Ann Flynn, Acting Deputy Assistant General Counsel and John D. McNamee, were on the brief, for appellee.

Before NEBEKER, Chief Judge, and KRAMER, FARLEY, HOLDAWAY, IVERS, STEINBERG, and GREENE, Judges.

FARLEY, Judge, filed the opinion of the Court, STEINBERG and KRAMER, Judges, filed a dissenting opinion.

FARLEY, Judge:

This is an appeal from an April 8, 1998, decision of the Board of Veterans' Appeals (BVA or Board) which denied the appellant's claim for service connection for residuals of a head injury with syncope (a faint or swoon), and possible brain lesion. Record (R.) at 2; *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (DORLAND'S) 1628 (27th ed.1988). This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. § 7252(a). Oral argument was held on July 27, 1999, and the matter was submitted to a panel of this Court. During the internal circulation of the panel decision in this matter, a judge requested en banc consideration which was subsequently granted. *See* the Court's Internal Operating Procedures at V.(a)(3). For the reasons that follow, the Court will affirm the BVA decision.

## I. FACTS

The appellant had active military service from January 1944 to April 1946, including service during World War II in the Asian Pacific theater. R. at 11. His service medical records (SMRs) reflect that he had an appendectomy for chronic appendicitis in July 1945, while aboard the U.S.S. *New Mexico*. R. at 27–28. His separation examination of April 1946 listed his only physical defect as an appendectomy scar. R. at 31. The only other available SMRs consist of his entrance examination, his dental records, and immunization records. R. at 26, 28, 30–34, 179. The appellant filed an initial claim for service connection for a head injury with brain tumor in July 1986. *See* R. at 44. It was denied by an unappealed rating decision in September 1986. R. at 44, 46. He asserted that he had suffered head trauma on the U.S.S. *New Mexico* when he was thrown 6–8 feet into the air and hit his head on a wall during a kamikaze attack on the ship. He further asserted that he incurred a shrap-

nel injury to the left leg in the same incident. Service connection was granted for residuals of a shrapnel wound to the left leg based on a private medical examination which revealed a scar medial to the left patella and showed black metal that appeared to be shrapnel embedded in the skin beneath the scar and its verification by a VA examination. R. at 75, 137.

In a rating decision of November 1994, the VA regional office (RO) confirmed and continued the denial of the appellant's claim for service connection for residuals of a head injury on the basis that no new and material evidence had been submitted. R. at 72–73. In December 1994, the appellant filed a Notice of Disagreement (NOD) with the rating decision. R. at 84. He also submitted photos of the U.S.S. *New Mexico* under attack. R. at 79–81. A March 15, 1985, letter from Dr. John E. McAllister, a neurological surgeon, to Dr. Thomas S. Peck, the appellant's referring physician, was submitted. Dr. McAllister stated that his examination of the appellant was "normal except for an old cycloplegia of the left iris causing his left pupil to be greater than the right, but that is from an injury in the second world war." He added that:

I reviewed his [computerized tomography (CT)] scan . . . and indeed he does have a calcified lesion in the right medial inferior temporal lobe which is probably an old blood clot which is calcified from his war injuries. I don't think it is causing any trouble whatsoever. It looks static. It causes no mass effect and has probably been there since the second world war. . . .

R. at 107. The March 11, 1985, CT scan report, which also appears from the record to have been prepared by Dr. McAllister, showed "a 1.35 cm. mass in the right temporal lobe medially, which [was] partially calcified and quite round, and very dense." R. at 108. It appeared to be "quite old." *Id.* Contrast enhancement provided no additional information concerning etiology.

Dr. McAllister's impression was an old calcified lesion of the right temporal lobe, which could be a calcified hematoma, or an intraventricular meningioma. An old hemorrhage, which is calcified, was mentioned as another possibility. R. at 108–09. A repeat CT scan in October 1985 showed that the calcified old hematoma or old clot was static. R. at 110. A statement from one of the appellant's shipmates indicated that he remembered the appellant getting hurt on a 40 mm. mount, but that he did not remember what battle it was in. R. at 120. The appellant presented an excerpt from the "Dictionary of Naval American Fighting Ships" which documented his account of the U.S.S. *New Mexico's* having been attacked by two Japanese suicide-bombers in May 1945, wounding 115 and killing 54. R. at 125–26.

A magnetic resonance imaging (MRI) of the brain performed in April 1995 showed a 3 cm. mass on the right medial temporal lobe, identified by the staff physician as an arteriovenous malformation (AVM) which was stated to be unchanged from 1991. R. at 128. A VA neurological examination performed by Dr. S. Oraee in September 1995 reported no neurological abnormalities "except for anisocoria with the right pupil being smaller than the left." R. at 133. Dr. Oraee interpreted the 3 cm. mass shown on the 1995 MRI as most consistent with a calcified cavernous angioma versus a small AVM. R. at 134. He stated: "There is no surrounding edema and there is no mass effect. This lesion has not changed from the MRI in 1991 and reports of a [CT] scan that were done previous to 1991." *Id.* He further stated that "[c]avernous angiomas or small [AVMs] are congenital abnormalities and one would have difficulty relating them to a brain injury." *Id.* He noted that the anisocoria was old and opined that it may be due to an old injury as well as other possible causes. *Id.* Dr. Oraee recalled that he had seen the appellant previously on April 10 of that year at the outpatient clinic when the appellant came in complaining of headaches. R. at 133. He observed that the appellant

had been evaluated by Dr. McAllister in 1985 at which time the appellant had been told that a calcified mass "may be due to a blood clot indeed after the injury." *Id.* Dr. Oraee then stated:

> This statement has been fixed in his mind, and he was very resistant to any new differential diagnosis. He got very disgusted when I told him my opinion. At that time, he had completely normal neurological examination except for anisocoria with the right pupil being smaller than the left. His attitude is exactly the same as then and continues to search for an answer.

*Id.*

A BVA decision of March 1997 reopened the appellant's claim and remanded it to the RO for additional development and readjudication. Specifically, the Board ordered that:

> The veteran should be afforded a VA neurological examination, by a neurologist who has not examined him previously, to determine the nature and etiology of any brain pathology found. The examiner should provide a diagnosis for any brain pathology found and an opinion as to whether it is at least as likely as not that such pathology resulted from a head injury in service. The clinical findings and reasoning which form the basis for the diagnosis and opinion should be clearly set forth.... The claims folder must be available to the examiner for review in conjunction with the examination. The examiner's attention is particularly directed to the March 1985 letter from [Dr.] McAllister ... to [Dr.] Peck ... and other treatment records associated with said letter, as well as the report of the September 1995 ... examination....

R. at 202.

On April 29, 1997, Dr. Roy R. Goodman performed a VA neurology examination. A review of the appellant's treatment records and his claims file was undertaken at that time. R. at 235. Dr. Goodman noted

that the appellant had struck his head when his ship was attacked during World War II. *Id.* He observed that a calcified large right temporal lesion had been noted in a CT scan in 1985 and referred to a "subsequent MRI and angiogram in 1991 and 1994 with the diagnosis of arteriovenous malformation." *Id.* He noted that the lesion was within the brain with no edema and no attachment to bone or meninges. *Id.* He also noted that the lesion was "not a meningioma, a type of tumor that has on occasion been associated with trauma." *Id.* He stated that it was his impression that the appellant's episodes of syncope and dizziness were probably partial complex seizures secondary to his right temporal AVM. R. at 236. He opined:

> There is no indication based on the patient's history of any temporal relationship between the onset of these syncopal spells, probable seizures, and [his] head injury which occurred approximately 35 years prior to development of symptoms in either the early or mid 80s. There is no evidence of any causal relationship between the head injury and [AVM]s of the type that Mr. Kessel has.

R. at 236.

VA outpatient records dating from February 1996 to August 1997 noted the existence of a scar on the right occiput, the back part of the head. R. at 160, 161, 246; *see also* DORLAND'S at 1164. The August 1997 entry identified it as a scar "from shrapnel injury per patient." R. at 246. On April 8, 1998, the Board determined that the preponderance of the evidence was against the appellant's claim for service connection for residuals of a head injury with syncope and possible brain lesion and denied the claim. R. at 2. This appeal followed.

## II. ANALYSIS

### A. 38 U.S.C. § 1154(b)

In its April 8, 1998, decision, the Board expressly noted that "what is at issue in this appeal is **not** whether the veteran sustained a head injury during World War II, but whether he has [a] current disability which is related to such injury." R. at 6 (emphasis in original). The Board then denied the appellant's claim because it found that "the preponderance of the evidence [was] against the claim for service connection." R. at 2. Before this Court, the appellant argues that the Board applied the wrong legal standard. In the appellant's view, as iterated both in his supplemental brief and at the July 27, 1999, oral argument before a panel of this Court, 38 U.S.C. § 1154(b) applies and under that statute his claim can only be denied if the evidence to the contrary rises to the level of "clear and convincing," which is a weight greater than the "preponderance" standard used by the Board. As support for this proposition, the appellant seeks to rely upon the recent decision of this Court in *Arms v. West,* 12 Vet.App. 188 (1999). It is to this argument which we will turn first.

The proper interpretation of a statutory provision is a question of law which this Court reviews de novo. *See Butts v. Brown,* 5 Vet.App. 532, 539 (1993) (en banc) (conclusions of law are reviewed by this Court under a de novo standard of review). "The starting point in interpreting a statute is its language, for 'if the intent of Congress is clear, that is the end of the matter.'" *Cacatian v. West,* 12 Vet.App. 373, 376 (1999) (quoting *Gardner v. Brown,* 5 F.3d 1456 (Fed.Cir.1993), *aff'd,* 513 U.S. 115, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994)). A determination of a statute's plain meaning involves examining the specific language at issue and the statute's overall structure. *Id.; see also Meeks v. West,* 12 Vet.App. 352 (1999) ("Principals of statutory construction require that, where a statute has a plain meaning, a Court shall give effect to that meaning.... '[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole.'"). We do not, howev-

er, interpret statutes at whim or in a vacuum. In playing our role as statutory law interpreters, we are controlled by binding precedent, that is, our own prior precedential decisions as well as the decisions of the Court of Appeals for the Federal Circuit and the U.S. Supreme Court. *Brewer v. West*, 11 Vet.App. 228, 233 (1998) (Court held that it was bound to follow controlling Supreme Court precedent); *Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992) ("Where there is an earlier panel or en banc opinion, we apply a rule that in a subsequent case, a panel or single judge may not render a decision which conflicts materially with such earlier panel or en banc opinion.... Only the en banc Court may overturn a panel decision."). This control mechanism is in place so that we may "assure consistency of our decisions." *Id.*

*1. The Construction of the Statute*

Section 1154(b), title 38, of the U.S.Code states:

> In the case of any veteran who engaged in combat with the enemy in active service with a military, naval, or air organization of the United States during a period of war, campaign, or expedition, the Secretary shall accept as sufficient proof of *service-connection* of any disease or injury alleged to have been incurred in or aggravated by such service satisfactory lay or other evidence of service incurrence or aggravation of such injury or disease, if consistent with the circumstances, conditions, or hardships of such service, notwithstanding the fact that there is no official record of such incurrence or aggravation in such service, and, to that end, shall resolve every reasonable doubt in favor of the veteran. *Service-connection* of such injury or disease may be rebutted by clear and convincing evidence to the contrary. The reasons for granting or denying *service-connection* in each case shall be recorded in full.

■ The emphasized term "service-connection" is used in all three sentences of the section. A basic canon of statutory construction is that "identical terms within an Act bear the same meaning." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *see also Reno v. Koray*, 515 U.S. 50, 58, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995); *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986) (quoting *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 87, 55 S.Ct. 50, 79 L.Ed. 211 (1934) (in turn quoting *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932))) ("The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'"). In *Atlantic Cleaners & Dyers*, 286 U.S. at 433, 52 S.Ct. 607, the Court, after noting the natural presumption that identical words used in different parts of same act are intended to have the same meaning, nevertheless held that "[w]here the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different ... the meaning well may vary to meet the purposes of the law." Unlike in *Atlantic Cleaners & Dyers*, the subject matter in all three sentences of section 1154(b) is the same and thus there is no basis for any variance.

■ In defining the term "service-connection" as it appears in section 1154(b), the Court has looked to the definition of "service-connected" in 38 U.S.C. § 101(16): "with respect to disability or death, that such disability was incurred or aggravated ... in line of duty in the active military, naval, or air service." *See Caluza v. Brown*, 7 Vet.App. 498, 507 (1995), *aff'd per curiam*, 78 F.3d 604, 1996 WL 56489 (Fed.Cir.1996) (table). Thus, the Court has held: "The term 'service-connection' is used in section 1154(b) to refer to proof of incurrence or aggravation of that disease or injury in service, rather than to ·the

legal standard for entitlement to payments for disability." *Id.; see also Velez v. West,* 11 Vet.App. 148, 153 (1998). We also note that this definition is in perfect harmony with the virtually identical phrase, "disease or injury alleged to have been incurred in or aggravated by such service," which appears within section 1154(b) itself.

■ Since *Caluza,* this Court has held to that definition in an unbroken line of cases. *See Boyer v. West,* 11 Vet.App. 477, 478 (1998); *Wade v. West,* 11 Vet.App. 302, 304–05 (1998); *Velez,* 11 Vet.App. at 154–55; *Turpen v. Gober,* 10 Vet.App. 536, 539 (1997); *Brock v. Brown,* 10 Vet.App. 155, 162 (1997) (quoting *Caluza,* 7 Vet.App. at 507, the Court stated that "[t]he evidentiary burden provided for combat veterans by 38 U.S.C. § 1154(b) related only to the question of service *incurrence,* that is, what happened then—not the questions of either current disability or nexus to service . . . ." (emphasis in original)); *Libertine v. Brown,* 9 Vet.App. 521, 524 (1996); *Smith v. Brown,* 8 Vet.App. 546, 554 (1996); *Beausoleil v. Brown,* 8 Vet.App. 459, 464 (1996) ("Although section 1154(b) relaxes the evidentiary requirement as to the evidence needed to render a claim well grounded, that section deals only with the occurrence of an event . . . ."). Moreover, in its most recent decision addressing section 1154(b), the Court recognized that the provisions of this section "do not provide a substitute for medical nexus evidence, but rather serve only to reduce the evidentiary burden for combat veterans with respect to the second *Caluza* requirement, the submission of evidence of incurrence or aggravation of an injury or disease in service." *Clyburn v. West,* 12 Vet.App. 296, 303 (1999); *see, e.g., Collette v. Brown,* 82 F.3d 389, 392 (Fed.Cir.1996) ("Section 1154(b) does . . . considerably lighten the burden of a veteran who seeks benefits for an allegedly service-connected disease or injury and who alleges that the disease or injury was incurred in, or aggravated by, combat service.")

■ There is nothing in the statutory language of 38 U.S.C. §§ 1154(b), 5107, or this Court's case law to suggest that the meaning of the phrase "service connection" somehow changes during the adjudication process once the appellant has submitted a well-grounded claim. Section 1154(b) neither cross-references section 5107 nor does it state that the statute's interpretation is dependent upon whether a claimant submits a well-grounded claim. Indeed, in *Wade,* this Court recognized that

> a combat veteran who has successfully established the in-service occurrence or aggravation of an injury pursuant to § 1154(b) and *Collette,* must still submit sufficient evidence of a causal nexus between that in-service event and his or her current disability as required by *Caluza. This is necessary for a claimant both to meet his or her initial burden of submitted a well-grounded claim, and, of course, to be ultimately successful on the merits.*

11 Vet.App. at 305 (emphasis added).

Equating the section 1154(b) phrase "service connection" with service incurrence or aggravation fulfills the stated purpose of 38 U.S.C. § 1154(b), which was "to overcome the adverse effect of a lack of official record of incurrence or aggravation of a disease or injury and treatment thereof." *Smith v. Derwinski,* 2 Vet.App. 137, 140 (1992) (citing H.R.Rep. No. 1157, 77th Cong., 1st Sess. (1941), reprinted in 1941 U.S.C.C. Service 1035); *Caluza,* 7 Vet. App. at 507. In the combat arena, the injured are not likely or expected to fill out forms; front line medics are too involved with saving lives to document injuries and file reports; and what medical records might be generated are liable to be misfiled, lost, or destroyed. Yet, at the same time, the House Report explained that it was not instituting an automatic award of benefits because of combat service:

> It is the purpose of the bill to place in brief legislative form the policy of the Veterans' Administration governing determination of service connection, with

particular reference to determinations of fact pertaining to those persons who engaged in combat with the enemy in active service with a military or naval organization of the United States during some war, campaign, or expedition. The language of the bill has been carefully selected to make clear that a statutory presumption in connection with determination of service connection is not intended. The question as to whether any disability was or was not incurred in active military service is recognized as a question of fact to be determined upon the evidence in each individual case. It is desired to overcome the adverse effect of a lack of official record of incurrence or aggravation of a disease or injury and treatment thereof.

H.R.Rep. No. 1157, 77th Cong., 1st Sess.; *accord Collette,* 82 F.3d at 392 ("Section 1154(b) does not create a statutory presumption that a combat veteran's alleged disease or injury is service-connected.").

▪▪▪ Section 1154(b) necessarily focuses upon *past* combat service and, for this reason, it does not constitute a substitute for evidence of *current* disability, causal nexus between a combat service injury or disease and a *current* disability, or the continuation of symptoms *subsequent to service.* Nevertheless, section 1154(b) does provide a significant benefit for a combat veteran in that it relaxes the evidentiary requirement regarding the *service incurrence or aggravation* of a disease or injury in service. *Beausoleil,* 8 Vet.App. at 464. For purposes of submitting a well-grounded claim, a combat veteran's statements, as well as those of a noncombat veteran, standing alone, will generally be sufficient to establish the service-incurrence element. *Nolen v. West,* 12 Vet.App. 347, 350 (1999). Once a claim is found well grounded and the claim moves to the merits adjudication stage, the true benefit of section 1154(b) for the combat veteran is realized. When adjudicating a claim on the merits under 38 U.S.C. § 1154(b), the combat veteran will be

found to have established sufficient evidence of service incurrence or aggravation by his or her own testimony unless "there is 'clear and convincing evidence' that the disease or injury was *not* incurred or aggravated in service. . . ." *Caluza,* 7 Vet. App. at 508 ("[T]he Court concludes today that the *effect* of section 1154(b), . . . is that when in the case of a combat veteran the three section 1154(b) elements are satisfied section 1154(b)'s relaxation of adjudication evidentiary requirements dictates that the veteran's 'lay or other evidence' be accepted as sufficient proof of service incurrence or aggravation unless there 'is clear and convincing' evidence that the disease or injury was *not* incurred or aggravated in service or during an applicable presumption period." (Emphasis in original.)) A noncombat veteran's claim must be denied if there is a preponderance of evidence against service incurrence or aggravation; with regard to that element, a combat veteran's claim cannot be denied unless there is "clear and convincing" evidence to the contrary.

### 2. Arms v. West

▪▪▪ The Board here, as noted above, explicitly stated that whether the veteran was injured in combat was not at issue; thus, it must and will be assumed that the veteran has established service connection under 38 U.S.C. § 1154(b), i.e., that he incurred an injury during combat. Nevertheless, purporting to rely upon this Court's decision in *Arms,* the appellant argues that he is entitled to prevail because the Secretary has not presented clear and convincing evidence against the claim. Appellant's Supplemental Brief (Br.) at 7–8. The appellant submits that "other cases decided by this Court before and after *Arms,* which said that section 1154(b) only applies to occurrence evidence, were either incorrect as a matter of law or were examining the first sentence of § 1154(b)." *Id.* The Secretary, relying upon *Caluza* and its progeny, argues that the "clear and convincing evidence to the contrary" provision of § 1154(b) applies

only to the service incurrence element of a claim and that it is inapplicable to the current disability and nexus elements. In other words, it is the Secretary's position that where, as here, the determinative issue is nexus, i.e., the causal linkage between an injury incurred in combat and a current disability, *Arms* and section 1154(b) are not applicable. The Secretary is correct.

In *Arms*, a World War II combat veteran appealed a Board decision which had denied service connection for a number of claims. With respect to the veteran's lower extremities wounds and scars claim, the Board concluded "on the merits that the claim was not service connected." 12 Vet. App. at 198. The Court found that the Board had erred in two respects when it determined that there was "clear and convincing evidence in contradiction of the veteran's testimony that his wounds were incurred during his service." *Id.* First, the Board had erred when it concluded that "with the amount of [SMRs] available for review, it would be expected that at least one of those records would contain some reference to wounds of the lower extremities" where the veteran's sworn testimony and SMRs were to the contrary. *Id.* at 198–99. Second, the Court found "problematic" "the Board's reliance on the absence of an official record of treatment for that injury." *Id.* at 199. Based upon the Court's analysis of the "Role of Section 1154(b)," the "notwithstanding" clause of that section, and its legislative history, it held that "the Board decision here incorrectly construed and applied section 1154(b) by using 'the fact that there is no official record' . . . to rebut the veteran's lay evidence." *Id.* As to other claims, the Court concluded that the service incurrence element had been satisfied by virtue of section 1154(b), but the claims were not well grounded because there was no evidence of current disability, medical nexus, or both. The Court was never called upon to reach a determination concerning medical nexus or current disability evidence at the merits adjudication stage.

Unlike the "nexus" case presently before the Court, *Arms* was a "service incurrence" case. The sole question presented for review was whether the veteran had suffered lower extremities wounds and scars during combat, and its specific frame of reference was the "notwithstanding the fact that there is no official record of such incurrence or aggravation in such service" clause of the first sentence of section 1154(b). At no point was the applicability of section 1154(b) to evidence of a current disability or causal nexus at issue. Although the Court in *Arms* did delve into the legislative history of section 1154(b) and provide a detailed analysis of that section, the resulting holding could only have been in the context of service incurrence because that is all that was before the Court. Anything else would have been obiter dictum.

The appellant relies principally upon the following language in *Arms*, 12 Vet.App. at 195:

> In sum, . . . we have concluded that under section 1154(b) once a combat veteran's claim for service connection of a disease or injury alleged to have been incurred in or aggravated in combat service is well grounded under *Caluza* and *Epps* . . . then the claimant prevails on the merits **unless** VA produces "clear and convincing evidence" to the contrary—that is, unless VA comes forward with **more than** a preponderance of the evidence against the claim.

*See also id.* at 196–97. Standing alone, without either substantive or contextual references, it is perhaps understandable that the appellant would seek comfort in the quoted sentence. However, the sentence cannot be viewed in isolation. As this Court has been reminded by the Federal Circuit, "[i]t is axiomatic that the language . . . must be read in light of the facts and issues that were before the court when the language was written." *Grantham v. Brown*, 114 F.3d 1156, 1158 (Fed. Cir.1997). The facts before the Court in

*Arms* involved service incurrence and the issue was the correct application of section 1154(b) to those facts. Moreover, the Court, prior to the sentence relied upon by the appellant, had expressly stated that "[b]ecause section 1154(b) does not obviate the other two *Caluza* requirements, a combat veteran who uses lay testimony to show incurrence or aggravation must nevertheless generally proffer medical evidence to establish a current disability and its nexus to service ..." *Arms*, 12 Vet. App. at 195. Therefore, in order for the Court to credit the appellant's argument, we would not only have to ignore the direction of the Federal Circuit to construe language in light of the factual and legal issues before the Court in *Arms*, as well as the actual language of the opinion, but we also would have to accept, contrary to *Bethea*, *supra*, that a panel opinion replaced all of the existing (and subsequent) jurisprudence of this Court. This we cannot and will not do. Further, in order to ensure that there is precision in the jurisprudence of this Court, we today overrule *Arms* to the extent that it might be read as establishing by holding or implying in dicta that there is a broader role for section 1154(b) than we affirm today.

### B. Claim for Residuals of a Head Injury with Syncope and Possible Brain Lesion

 The BVA's determination as to service connection is a finding of fact. *Irby v. Brown*, 6 Vet.App. 132, 135 (1994); *Swann v. Brown*, 5 Vet.App. 229, 232 (1993); *Wood v. Derwinski*, 1 Vet.App. 190, 192 (1991). This Court must affirm findings of fact made by the Board unless they are found to be "clearly erroneous." 38 U.S.C. § 7261(a)(4). "[T]his Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible' basis in the record for the factual determinations of the BVA ... we cannot overturn them." *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990). In a case involving a combat veteran, section 1154(b) of title 38, United

States Code, relaxes the evidentiary requirements for adjudication of certain combat-related VA-disability-compensation claims. However, as this Court has held today in Part II.A, *supra*, section 1154(b) does not obviate the requirement that the appellant submit evidence of a current disability and evidence of a nexus between the current disability and service to well ground a claim and to succeed on the merits of his claim. *See Clyburn*, 12 Vet. App. at 303; *see also Velez*, 11 Vet.App. at 153. Moreover, the BVA is statutorily required to provide, in its decisions, a "written statement of the Board's findings and conclusions, and the reasons or bases for those findings and conclusions." 38 U.S.C. § 7104(d)(1); *see, e.g., Gilbert v. Derwinski*, 1 Vet.App. 49. "[T]he Board must identify those findings it deems crucial to its decision and account for the evidence which it finds to be persuasive or unpersuasive." *Id.* at 57. It cannot reject evidence favorable to the claimant without providing adequate reasons or bases for its decision. *Meyer v. Brown*, 9 Vet.App. 425, 433 (1996); *see also Pond v. West*, 12 Vet.App. 341 (1999).

 In denying the appellant's claim for service connection, the Board recognized the applicability of section 1154 but explained—correctly; *see* Part II.A., *supra*—that "what is at issue in this appeal is **not** whether the veteran sustained a head injury during World War II, but whether he has [a] current disability which is related to such injury." R. at 6–7 (emphasis in original). The Board stated that the evidence favoring allowance of the appellant's claim included his own statements as well as the statement from his shipmate; a letter dated March 15, 1985, from Dr. McAllister; and a November 1995 letter from his sister, a registered nurse. Relying on *Espiritu v. Derwinski*, 2 Vet.App. 492 (1992), the Board found that the statements from the appellant and his shipmate were not competent to establish medical nexus. R. at 7. The Board also found that the statements from Dr. McAllister

and the appellant's sister, although opining that the appellant's current injury manifested itself in service, did not explain a basis or cite authority for such opinions. *Id.* The Board explained that Dr. McAllister had based his opinion on a CT scan report and the veteran's account of his medical history, but the CT scan report was equivocal in that it speculated "as to several possible bases for the [appellant's] brain pathology." *Id.* The Board concluded that the evidence against the appellant's claim, notably the September 1995 and April 1997 neurological examinations, outweighed the probative value of the evidence in support of his claim. R. at 7–8. The Board placed specific reliance upon the "comprehensive" review of the veteran's medical records in the April 1997 neurological examination and the resulting expert opinion that "there [was] no indication of a temporal relationship between the onset of [the appellant's] syncopal spells, probable seizures[,] and his head injury, which occurred many years prior to the onset of his current symptoms." R. at 7.

The record shows that the September 1995 neurological examination, which was relied upon by the Board specifically, found that "cavernous angiomas or small arteriovenous malformations are congenital abnormalities and one would have difficulty to relate them to a brain injury." R. at 134. Similarly, the April 1997 neurological examination, which was conducted as directed in the Board's remand, found that there was neither an indication of a temporal relationship between the appellant's syncopal spells and his in-service head injury nor any evidence of a causal relationship between a head injury and the appellant's AVMs. R. at 236. Accordingly, the Court holds that there was a plausible basis in the record for the Board's determination and the decision shall be affirmed.

Relying on *Felden v. West,* 11 Vet.App. 427 (1998), the appellant argues that "[i]t was error for the BVA to require [Dr. McAllister] to provide detailed reasons and bases for his opinion." Appellant's Br. at 11. In *Felden,* the Court determined that a physician who had performed reconstructive surgery on a veteran and wrote a letter specifically discussing the surgery and concluding that the veteran could not return to work for a period of time "was not required to give detailed reasons and bases for his opinion about his own patient's state of employability." *Id.* at 431. The Court reasoned that "[t]he connection between the [veteran's] unemployability and the operation was apparent from the doctor's letter." *Id.* Unlike *Felden,* however, the connection between this appellant's in-service head injury and his "calcified lesion in the right medial inferior temporal lobe" is not apparent from the doctor's letter, especially in light of the fact that the CT scan which was reviewed by Dr. McAllister and which formed the basis for his opinion, showed upon "[c]ontrast enhancement . . . nothing remarkable and no additional clues to [the lesion's] etiology" and his impression was that the lesion "could be a calcified hematoma or even an intraventricular meningioma" or an old hemorrhage. R. at 17; *see also Bloom v. West,* 12 Vet.App. 185, 187 (1999) (physician's statement of opinion that veteran's respiratory problems contributed to his death without further support was insufficient to constitute medical nexus).

The appellant next argues that he was entitled to the presumption of soundness under 38 U.S.C. § 1111. Appellant's Br. at 12. Under the presumption of soundness, a veteran is presumed to be "in sound condition when examined, accepted, and enrolled for service, except as to defects, infirmities, or noted at the time of the examination. . . ." 38 U.S.C. § 1111; *see also* 38 C.F.R. § 3.304(b). The presumption of soundness is inapplicable where, as here, the determinative issue is not in-service incurrence of the appellant's head injury but a causal relationship between the head injury and the appellant's syncope and possible brain lesion. *See, e.g., Winn v. Brown,* 8 Vet.App. 510 (1996).

Specifically, had the presumption of soundness been applied by the Board, the appellant would have been presumed to have incurred his head injury in service, nothing more. Here, this fact is not contested nor is the appellant's condition upon entry into service under debate.

Relying on *Boggs v. West,* 11 Vet.App. 334 (1998), and *West v. Brown,* 7 Vet.App. 70 (1994), the appellant further argues that the compensation and pension examinations given to him were inadequate because they did not contain "an adequate history concerning the veteran's injury and the sequella of a scar and uneven pupil size" and neither examination "integrated the findings and the history." Appellant's Br. at 13. In *Boggs,* the Court declined to adopt the "universal rule proffered by the appellant" that, "pursuant to *West,* a remand is required if, as the Board noted, the examination was insufficient." 11 Vet. App. at 345. The Court stated that "[a]lthough the examination appeared to have been based upon an inaccurate or incomplete history, ... the record, as a whole, is still sufficient for judicial review. The record is replete with additional medical records...." *Id.* In *West,* the Court had concluded that an examination which relied on inaccurate history was inadequate for rating purposes. 7 Vet.App. at 78. Upon review of the record, the Court finds no evidence to support the appellant's contention that the September 1995 and April 1997 VA examinations relied on an inaccurate history. Thus, the appellant's reliance on *Boggs* and *West* in this respect is misplaced.

 The appellant also argues that the Board failed to provide adequate reasons or bases for its rejection of Dr. McAllister's conclusions and for its conclusion that the evidence was not in equipoise. Appellant's Br. at 10–12. The Board "must assess the credibility and probative value of evidence." *Evans v. West,* 12 Vet.App. 22 (1998). It may favor one medical opinion over another provided that it offers an adequate statement of reasons or bases. *Id.* Here, the Board discussed each piece of evidence favoring the appellant's claim and explained why it was less probative in value than the evidence which did not support the appellant's claim. The Board also stated the reasons for its determination that the April 1997 neurological examination was more probative than Dr. McAllister's letter. Contrary to the appellant's argument, the Court finds that the Board's assessment of the weight and credibility given to the evidence and the Board's denial of the appellant's claim were supported by an adequate statement of reasons or bases under 38 U.S.C. § 7104(d)(1). *See Meyer,* 9 Vet.App. at 433; *see also Boggs,* 11 Vet.App. at 345.

## C. Benefit of the Doubt

The appellant asserts that he did not receive the benefit of the doubt to which he was entitled by 38 U.S.C. § 5107(b). The gravamen of the appellant's argument is that the BVA erred in relying upon and applying the language on the benefit of the doubt standard in *Gilbert, supra,* .which the appellant opines was wrong from its inception. In the appellant's view, the language of *Gilbert* "does not appear in the statute and most importantly that language is contrary to the intent of and a plain reading of the statute." Appellant's Supplemental Br. at 2–3. At the July 27, 1999, oral argument before a panel of this Court, the appellant urged, in essence, that once the veteran has a well-grounded claim, he has a substantial claim and must prevail as a matter of law because section 5107(b) does not allow VA to deny the benefit of the doubt to a veteran based on evidence preponderating against his claim. *But see Epps v. Gober,* 126 F.3d 1464, 1469 (Fed.Cir.1997), *cert. denied,* 524 U.S. 940, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998) ("A 'well grounded' claim as initially submitted under § 5107(a) is not necessarily a claim which will ultimately be deemed allowable under § 5107(b)."). Finally, the appellant submits that where there is some credible evidence in support of the veteran's claim,

even though there might be more credible evidence against the claim, the veteran must win because of the benefit of the doubt.

■ In effect, the appellant is requesting that this Court overrule *Gilbert* and its progeny. We decline his invitation. Recently, in *Schoolman v. West,* 12 Vet.App. 307, 311 (1999), this Court determined that "the statute and the regulation make clear, [that] the benefit of the doubt doctrine of § 5107(b) does not apply until *'after* consideration of all evidence and material of record.'" (Emphasis in original). Further, the benefit of the doubt doctrine is not applied unless the evidence of record is in equipoise and "has no application in those cases where the preponderance of the evidence is against the appellant's claim." *Id.; see generally Epps,* 126 F.3d at 1469 ("claimants who are entitled to DVA assistance under § 5107(a) (i.e., those submitting plausible claims) may need DVA's assistance to ultimately *prove* the allowability of their claims under § 5107(b) (if, for example the evidence for and against the claim is nearly in balance.") (emphasis added)). Accordingly, because there is a plausible basis in the record for the Board's decision that the preponderance of the evidence was against the appellant's claim, the benefit of the doubt doctrine does not apply.

### D. Other Claims

The appellant argues that the Board failed to adjudicate his claims for unequal pupil size and for a "shrapnel scar to the head which he states was reasonably raised by a liberal reading of the pleadings." Appellant's Br. at 14. He asserts that Drs. McAllister and Oraee, both on two different occasions, related the veteran's unequal pupil size to his injury in service. *Id.* He also states that, although the documented unequal pupil size was used as proof of trauma in March 1997, "the Board never considered whether a claim for service connection for unequal pupil size was well grounded." *Id.* Fur-

ther, he argues that "although there was undisputed evidence of a shrapnel wound to the veteran's skull, and although the veteran referred to that evidence of proof of a head injury in service, the Board never considered whether a claim for service connection for a shrapnel scar to the head was well grounded." *Id.*

■ Section 5101 of title 38, U.S.Code provides in relevant part:

A *specific claim* in the form prescribed by the Secretary ... *must be filed* in order for benefits to be paid or furnished to any individual under the laws administered by the Secretary.

38 U.S.C. § 5101(a) (emphasis added); *see also Crawford v. Brown,* 5 Vet.App. 33 (1993). A claim is "a formal or informal communication in writing requesting a determination of entitlement, or evidencing a belief in entitlement, to a benefit." 38 C.F.R. § 3.1(p) (1997). An informal claim is defined as "[a]ny communication or action, indicating an intent to apply for one or more benefits under the laws administered by [VA]." 38 C.F.R. § 3.155(a) (1997). It "must identify the benefit sought." *Id.* This Court has held that "before a VARO or the BVA can adjudicate an original claim for benefits, the claimant must submit a written document identifying the benefit and expressing some intent to seek it." *Brannon v. West,* 12 Vet.App. 32 (1998); *see also Rodriguez v. West,* 189 F.3d 1351 (Fed.Cir.1999); *Jones v. West,* 136 F.3d 1296 (Fed.Cir. 1998).

Here, the appellant has admitted that he used the existence of his unequal pupils and a shrapnel scar to the head as evidence of proof of trauma and his head injury in service. Nowhere in the record is there any specific claim for service connection for unequal pupils or a shrapnel scar to the head, nor is there any indication of the appellant's intent to seek benefits as a result of his unequal pupils or the shrapnel scar that could constitute an informal claim. The Court also notes that

there is no evidence of record of an NOD as to the RO's failure to adjudicate such claims. Such an NOD would be necessary for this Court to exercise its jurisdiction over such claims. *See Hazan v. Gober*, 10 Vet.App. 511, 516–17 (1997).

To the extent that the appellant may be arguing that examination reports from Drs. McAllister and Oraee constitute informal claims, his argument again is without merit. While examination or hospitalization records may be considered informal claims, there must first be a prior allowance or disallowance of a former claim. 38 C.F.R. § 3.157(b); *see Crawford*, 5 Vet.App. at 35–36. Here, there has not been a prior allowance or disallowance of a claim for service connection for an unequal pupil or a shrapnel scar to the head; therefore, any examination reports of Drs. McAllister or Oraee could not be accepted as an informal claim. *Id.*

Finally, the Court notes that in his brief, the appellant reports having filed in February 1996 a claim for "an increase in [his] 0% service connected left knee." Appellant's Br. at. 14. No relief is requested and, on this record, none could be provided because there is neither an NOD nor a final RO decision concerning such a claim. *See Isenhart v. Derwinski*, 3 Vet.App. 177, 180 (1992).

## III. CONCLUSION

Upon consideration of the foregoing, the Court finds that the appellant has not demonstrated that the BVA committed either factual or legal error that requires reversal or remand. *See* 38 U.S.C. §§ 5107, 7104(d), 7261; *Gilbert*, 1 Vet.App. at 52–53. The April 8, 1998, BVA decision is AFFIRMED.

STEINBERG and KRAMER, Judges, dissenting:

We dissent from the en banc decision of the Court. We believe that it is wrongly decided and that under 38 U.S.C. § 1154(b) the appellant should prevail as to his head-injury claim unless the Board of Veterans' Appeals (BVA or Board) finds that there is "clear and convincing evidence" against that claim. We would thus vacate the BVA decision on that claim and remand the matter for application of that evidentiary standard under section 1154(b) and the holding of *Arms v. West*, 12 Vet. App. 188, 199 (1999).

Substantively, we disagree with the Court's conclusion that *Arms* was incorrect in holding, expressly and unanimously on this point, that after a combat veteran has submitted a well-grounded claim that claim "may be denied under 38 U.S.C. § 1154(b) only if 'clear and convincing evidence' (*more* than a preponderance of the evidence) is produced in accordance with this opinion to rebut an award of service connection—including the veteran's presumed-credible lay evidence." *Arms*, 12 Vet.App. at 199. Nonetheless, it is preferable that the en banc Court has resolved that matter definitively rather than relying on the labored efforts of a panel opinion to pretend that *Arms* had not held what it clearly did and did after extensive analysis. Although the Court's converted panel opinion goes to great lengths to attempt to demonstrate that *Arms* was not a binding precedent, the Court ignores the conclusion quoted from *Arms* above, under which the adjudication of Mr. Arms' claim was directed to be carried out by the Board on remand under section 1154(b) "after a medical examination [was] carried out on remand." *Arms, supra.* Indeed, *Arms* set forth its holding in this regard at two other points as well. Initially, the *Arms* opinion held that "in the event of . . . a well-grounded combat-related claim, the claimant prevails on the merits *unless* VA produces 'clear and convincing evidence' to the contrary." *Id.* at 195–96. The opinion then goes on to reiterate:

"Under section 1154(b), then, evidence sufficient to well ground a claim as to a combat-incurred or combat-aggravated disease or injury *does* require—in contrast to the situation as to a regular,

non-combat-related service-connection claim, *see Robinette* [*v. Brown,* 8 Vet. App. 69, 76 (1995) ]—*the award of service connection* unless service connection is rebutted by clear and convincing evidence under section 1154(b)'s second sentence."

*Arms,* 12 Vet.App. at 197 (emphasis added).

Simply stated, the *Arms* holding ordered to be applied to the remand proceedings in that case was: If a combat veteran submits a claim that is well grounded as to all *three Caluza* elements [1] (including medical evidence of nexus or the equivalent thereof), then the veteran prevails unless the Secretary finds that clear and convincing evidence rebuts any one of the three *Caluza* elements necessary to *an award* of service connection. This holding in *Arms* was admittedly an evolution of the Court's caselaw up to that time. The Court signaled that quite explicitly by stating: "[W]e have undertaken a reexamination of the language and structure of that provision, as well as of our opinion in *Caluza* [*v. Brown,* 7 Vet.App. 498 (1995),] and the Federal Circuit's *Collette* [*v. Brown,*] opinion, [82 F.3d 389 (Fed.Cir. 1996),] and contrasted adjudication under section 1154(b) for a combat veteran with adjudications under generally applicable law." *Arms,* 12 Vet.App. at 195.

It is important to keep in the forefront the statutory words that we are interpreting. They are:

In the case of any veteran who engaged in combat with the enemy in active service with a military, naval, or air organization of the United States during a period of war, campaign, or expedition, the Secretary shall accept as sufficient proof of *service-connection* of any disease or injury alleged to have been incurred in or aggravated by such service satisfactory lay or other evidence of service incurrence or aggravation of such injury or disease, if consistent with the circumstances, conditions, or hardships of such service, notwithstanding the fact that there is no official record of such incurrence or aggravation in such service, and, to that end, shall resolve every reasonable doubt in favor of the veteran. *Service-connection* of such injury or disease may be rebutted by clear and convincing evidence to the contrary. The reasons for granting or denying *service-connection* in each case shall be recorded in full.

38 U.S.C. § 1154(b) (emphasis added). In *Arms,* the Court noted explicitly that all the prior cases (now cited by the Kessel majority) had been interpreting the first sentence of section 1154(b) in reading "service-connection" as relating to only in-service incurrence. The *Arms* opinion then goes on in part II.B.1. to analyze the three sentences of section 1154(b) and to conclude that "service-connection" in the second and third sentences refers to the *award* of service connection, not just the service incurrence that the first sentence deals with. *Arms,* 12 Vet.App. at 195–97.

Although *Arms* does not specifically make the following point, we believe that it is a vital one in deciding whether the *Arms* interpretation is correct. As both *Arms* and the *Kessel* majority point out, section 1154(b) uses "service-connection" at three places. In only one place, the third sentence, is it *very clear* what the statute is referring to, and there it is clear that it is

1. Under *Caluza v. Brown,* 7 Vet.App. 498 (1995), *aff'd per curiam,* 78 F.3d 604, 1996 WL 56489 (Fed.Cir.1996) (table), for a service-connection claim to be well grounded a claimant must generally submit each of the following: (1) Medical evidence of a current disability; (2) medical evidence, or in certain circumstances lay evidence, of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the asserted in-service injury or disease and the current disability. *See Elkins v. West,* 12 Vet.App. 209, 213 (1999) (en banc) (citing *Caluza,* 7 Vet.App. at 506, and *Epps v. Gober,* 126 F.3d 1464, 1468 (Fed.Cir.1997) (expressly adopting definition of well-grounded claim set forth in *Caluza, supra* ), *cert. denied sub nom. Epps v. West,* 524 U.S. 940, 118 S.Ct. 2348, 141 L.Ed.2d 718 (1998) (mem.)).

talking about the ultimate *award* of benefits. The third sentence states: "The reasons for granting or denying service connection in each case shall be recorded in full." 38 U.S.C. § 1154(b). The words "granting" or "denying" are used throughout title 38 (the law and regulation) in the context of *the ultimate adjudication of a claim*. Perhaps the clearest example is in 38 U.S.C. § 7104(d)(2) where the law requires that each BVA decision contain "an order granting appropriate relief or denying relief." 38 U.S.C. § 7104(d)(2). Hence, it is "service-connection" in the *first* sentence that is the exception to the plain-meaning rule and to the rule applied by the Court that "identical terms within an Act bear the same meaning." *Ante* at 15. We stand by the reading of that sentence set forth by the Court in *Caluza*, and today adopted, without dissent, by the en banc Court. We must point out that in *Caluza*, which was authored by Judge Steinberg, the Court reached its limited reading of section 1154(b)'s first sentence by way of legislative history, and did so (as does the majority here) as to a provision that is arguably not ambiguous. *Caluza* did so to avoid what the Court believed would be an "absurd result"[2], although *Caluza* did not use that construct specifically.

In sum, *Arms* interprets section 1154(b) so as to provide an appreciable adjudicative benefit at the merits-adjudication stage for the combat veteran who has submitted a well-grounded claim for service connection. The "significant benefit" that *Kessel* now accords under section 1154(b) at the merits-adjudication stage is limited only to the incurrence element of *Caluza* and would apply only where the combat veteran's lay testimony is "consistent with the circumstances, conditions, or hardships

of such service". We do not believe that Congress in utilizing the term "service-connection" in the second and third sentences intended to limit the totality of section 1154(b)'s application to one-third of the evidence necessary for such service connection to be awarded.

For the foregoing reasons, we respectfully dissent from the Court's decision to overrule *Arms* regarding the reach of 38 U.S.C. § 1154(b).

---

**2.** *See Public Citizen v. Dep't of Justice*, 491 U.S. 440, 454–55, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 284, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987); *National R.R. Passenger Corp. v. Passengers Ass'n.*, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); *United Transp. Union v. ICC*, 871 F.2d 1114, 1118 (D.C.Cir.1989); *West Penn Power Co. v. EPA*, 860 F.2d 581, 587–88 (3d Cir. 1988); *In the matter of the Fee Agreement of Smith*, 1 Vet.App. 492, 506 (1991) (Steinberg, J., concurring); *see also Rowland v. California Men's Colony*, 506 U.S. 194, 200–01, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993).